697 So.2d 240 (1997)
Clement F. PERSCHALL, Jr.
v.
The STATE of Louisiana.
No. 96-CC-0322.
Supreme Court of Louisiana.
July 1, 1997.
*242 Tyron David Picard, Lafayette, Domengeaux & Wright, Mark Edward Stipe, Picard & Stipe, Lafayette, Peter J. Butler, Jr., Peter J. Butler, Richard Gary Passler, New Orleans, Breazeale, Sachse & Wilson, Baton Rouge, Robert McDuff, New Orleans, for applicant.
Clement F. Perschall, Jr., Metairie, Walter I. Willard, Lemle & Kelleher, Ronald Earle Wilson, William Patrick Quigley, New Orleans, Jacqueline Carr, Slidell, Theodore M. Shaw, Charles Stephen Ralston, Elaine R. Jones, Norman, J. Chachkin, New York City, Victor A. Bolden, Brooklyn, NY, Jacqueline A. Berrier, for respondent.
*243 KIMBALL, Justice.[*]
This declaratory judgment action challenges the validity of La. Acts 1992, No. 512 [hereinafter Act 512] under the Louisiana Constitution. Act 512 was adopted to resolve the issue in the matter of Chisom v. Edwards, a federal voting rights case that challenged the election of two of this court's seven justices from one district that includes Orleans Parish. The Chisom case was settled by the minority plaintiffs and the State by entry of a Consent Judgment in federal court that memorialized Act 512 and made it effective, which decree is currently under the jurisdiction of the United States District Court for the Eastern District of Louisiana.
In achieving the settlement remedy, Act 512 deferred redistricting the supreme court election districts into single-member districts until a later time, but implemented an immediate remedy by creating an additional court of appeal district composed of Orleans Parish to be filled by election in 1992, and ordered immediate assignment of the duly elected judge to the supreme court as its eighth member pursuant to this court's constitutional assignment power under article V, § 5(A). The plaintiff herein alleges, inter alia, this enactment violates the Louisiana Constitution in several respects, but especially article V, § 3, which states that the supreme court shall be composed of a chief justice and six associate justices.
After several supervisory writ applications to this court, and considering the public interest in an orderly process of government, we chose to exercise our supervisory jurisdiction over the entire matter which was remanded to the state trial court from the federal court in 1996, to first resolve threshold justiciability questions and, if necessary, to resolve the state law question raised by plaintiff's challenge. The federal court abstained from considering the state law question in consideration of jurisdictional and comity issues inherent in our federal system of government, which practice is referred to as Pullman abstention.[1]
The justiciability issue, arising after federal court abstention, presents the question whether plaintiff's state constitutional challenge is a justiciable controversy worthy of this court's resolution or whether this court's resolution would be nothing more than an advisory opinion. For the reasons discussed more fully below, we find the matter to be justiciable and worthy of opinion by the state's highest court, even though a state court is without authority to answer the ultimate federal issues that are pending in federal court.
Having concluded that a justiciable controversy exists, we reviewed the record evidence and the law applicable to plaintiff's constitutional challenge. Based on this review, we hold that Act 512 suffers from specific constitutional infirmities that require its invalidation. This holding is narrowly premised on the constitutional conflict that Act 512 creates between the state constitutional provision that imposes a numerative limit of justices on this court and the provision authorizing this court to assign lower court judges to any court. In so holding, we recognize the status quo shall remain intact, and this court, as it is currently composed and operating, shall continue to function as a de jure court under the Chisom Consent Judgment. Because it is not before us, we express no opinion on the effort to diversify this court's composition, nor does this opinion in any way diminish the hard work and service on this court of Justices Revius O. Ortique, Jr. and Bernette Joshua Johnson, the judges who have been elected to serve in the "Chisom seat". Rather, we only address the unsettled state law issue surrounding the relationship between the numerative limit of article V, § 3 and the assignment power provision of article V, § 5(A).

BACKGROUND

The Chisom Litigation
The substance of the legislative act, enumerated Act 512 of 1992, was the product of *244 settlement negotiations between all parties involved in lengthy federal litigation that challenged the composition of the Supreme Court of Louisiana as violative of the plaintiffs' rights protected by the Fourteenth and Fifteenth Amendments to the federal constitution and Section 2 of the Voting Rights Act of 1965, as amended.[2] In 1987, Ronald Chisom, four other black plaintiffs, and the Louisiana Voter Registration Education Crusade, filed a complaint on behalf of a class of all black persons registered to vote in Orleans Parish, alleging the method of electing justices from their districtthe first supreme court district, composed of Orleans, Jefferson, St. Bernard, and Plaquemines Parishesimpermissibly diluted minority voting strength. The Chisom plaintiffs brought suit against the governor and other state officials seeking a remedy that would have divided the first supreme court district into two districts, one for Orleans Parish and the second for the other three parishes. The United States intervened in support of the Chisom plaintiffs' claims.
In a pre-trial ruling, the United States District Court for the Eastern District of Louisiana dismissed the complaint for failure to state a claim upon which relief could be granted. Chisom v. Edwards, 659 F.Supp. 183 (E.D.La.1987). The court held the constitutional claims brought pursuant to the Fourteenth and Fifteenth Amendments were insufficient because the complaint did not adequately allege a specific intent to discriminate. Id. at 189. With respect to the statutory claim, the court held that Section 2 is not violated unless there is an abridgment of the minority voters' opportunity "to elect representatives of their choice." The court concluded that because judges were not "representatives," judicial elections were not covered by Section 2. Id. at 187.
The United States Court of Appeals for the Fifth Circuit reversed. Chisom v. Edwards, 839 F.2d 1056 (5th Cir.), cert. denied sub nom. Roemer v. Chisom, 488 U.S. 955, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988). The court recognized that Congress explicitly intended to expand Section 2 coverage by the 1982 Voting Rights Act amendment. Id. at 1061. The panel rejected the argument that the term "representatives" in the 1982 amendment was intended to constrain Voting Rights Act coverage, id. at 1063; rather, the court construed the amendment as enlarging minority protection against racial discrimination beyond that which the federal constitution provides, concluding the amended Section 2 "necessarily embraces judicial elections within its scope." Id. at 1061. In addition to reinstating the plaintiffs' Section 2 claim, the panel revived the constitutional claims dismissed by the district court, finding plaintiffs' contentions that the purpose and effect of this election practice was "to dilute, minimize, and cancel the voting strength" of black voters in Orleans Parish were sufficient to warrant trial. The case was remanded to the district court after the Supreme Court of the United States denied review.[3] 488 U.S. 955, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988).
On remand, the district court conducted a bench trial, ultimately concluding the evidence did not establish a Section 2 violation under the standards set forth in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).[4] The district court also *245 dismissed the constitutional claims. The Chisom plaintiffs and the United States appealed to the Fifth Circuit.[5] While the case was pending therein, the Fifth Circuit, sitting en banc in another Section 2 case, held that judicial elections were not covered under Section 2 of the Voting Rights Act as amended. See League of United Latin American Citizens Council No. 4434 v. Clements, 914 F.2d 620 (5th Cir.1990) (en banc) (LULAC).[6] Following the en banc decision in LULAC, the court of appeals remanded the Chisom litigation to the district court with directions to dismiss the complaint. Chisom v. Roemer, 917 F.2d 187 (5th Cir.1990). It expressed no opinion on the strength of the plaintiffs' case.
The United States Supreme Court granted certiorari. 498 U.S. 1060, 111 S.Ct. 775, 112 L.Ed.2d 838 (1991). In granting review, the Court limited its inquiry solely to the question of the scope of coverage under Section 2 of the Voting Rights Act as amended. 501 U.S. 380, 390, 111 S.Ct. 2354, 2361, 115 L.Ed.2d 348, 360 (1991). The Court explicitly did not address "any question concerning the elements that must be proved to establish a violation of the [Voting Rights Act] or the remedy that might be appropriate to redress a violation if proved." Id. On the merits of Section 2's scope, the Court held that state judicial elections are included within the ambit of Section 2 as amended. Thereupon, the Court reversed and remanded the case for further proceedings. Thus, the case was remitted to the Fifth Circuit where it remained until that court remanded the case to the district court in August 1992 to effectuate settlement. The Fifth Circuit dismissed the appeal in October 1992, noting a Consent Judgment was entered into by all parties and signed by the district court.

Act 512 of 1992: Origins and Purpose
In the 1992 Regular Legislative Session, Senator Charles D. Jones filed Senate Bill 1255, proposing to divide the first and third districts of the Court of Appeal, Second Circuit into two elections sections, each having one section with a majority black population and voter registration. In this original form, SB 1255 was read for the first and second time by title and referred to the Senate Judiciary A Committee, which discussed the bill in open committee on June 2, 1992. Senator Jones, together with Judge Bill Roberts, testified before the committee, and proposed a sweeping amendment to the bill which placed it largely in the posture that it finally passed the legislature and became Act 512. The clear purpose of the amendment, reflected by hearing transcripts, was to draft and pass legislation to aid in effectuating settlement of the Chisom case then pending before the Fifth Circuit. Before the committee, Judge Roberts explained:
Senator Kelly: Does this settle the Chisom case?
....
Judge Roberts: This is part of it. We then have to have a Consent Decree approved by the Fifth Circuit and Judge Schwartz. This is a part of it, but we felt that we needed to get the bill out and on the floor so thatbecause it's going to take us a few more days. We have worked on drafts, we have met with the Supreme Court a couple of times. I've had conversations with lawyers for the plaintiffs. We have not yet agreed on any exact wording on Chisom. If we do not agree, this bill is ineffective. If you notice there is a provision in the amendment that provides that unlessif the matter is not settled, then this bill is null and void.
*246 Minutes at 55, Louisiana State Senate, Judiciary A Committee (June 2, 1992). The exigency that Judge Roberts alluded to was prompted by the fact that while the legislature was in session, all parties involved in Chisom were attempting to settle the lengthy Chisom litigation. Senator Jones later explained to the committee that during the month of June 1992, the Justice Department was going to review drafts of the consent decree and "this bill", and "the person who's [sic] over the entire Civil Rights Division for the Department of Justice is going to pass on it." Id. Therefore, the bill's sponsor was attempting to place this legislation on the fast track to aid in effectuating settlement. Thus, the parties sought concurrent enactments to effectuate the case's settlement: (1) a legislative act, and (2) a federal consent judgment memorializing such act.
With that backdrop, the substantive amendments to SB 1255, converting the second circuit reapportionment bill to a supreme court reapportionment bill, consisted of a two-fold enactment. First, the bill would enact La.R.S. 13:101.1, relative to reapportionment of supreme court districts. Section 101.1 created a supreme court district comprised of Orleans Parish for the purpose of electing a justice, which justice would take office in the newly created district on January 1, 2000, or earlier if a vacancy occurred in the first supreme court district before January 2000. The section also instructed the legislature to reapportion the supreme court into seven districts in the 1998 Regular Session based on the most current census data.[7] These new districts would become effective on January 1, 2000 for elections occurring on or after January 1, 2000. Lastly, section 101.1 provided that the justices holding office on the effective date of the Act, June 22, 1992, would not be affected by section 101.1. In addition, retirement benefits provided by La.R.S. 11:558 (A)(5)(a)(ii) were extended to each justice holding office as of June 22, 1992.[8]
The second substantive amendment to SB 1255 proposed in committee was the enactment of La.R.S. 13:312.4. In short, section 312.4 created the "Chisom seat."[9] Section 312.4 would create an additional judgeship for the Court of Appeal, Fourth Circuit. The section provided that an election to this seat would take place in the 1992 congressional primary election, with the term of office commencing January 1, 1993. The section provided that pursuant to the power vested in the supreme court by LA. CONST. art. V, § 5(A), the judge elected to the fourth circuit seat would immediately be assigned by the supreme court to sit on the supreme court. While assigned, the section instructed that the judge would "participate and share equally in the cases and duties of the justices of the supreme court during the period of assignment. Further, the judge shall receive the same compensation, benefits, expenses, and emoluments of office as are now or as may hereafter be provided by law for justices of the Louisiana Supreme Court." Section 312.4 contained an expiration provision that would dissolve the "Chisom seat" on the first of two occurrences: (1) once a justice takes office in the new Orleans Parish district before January 2000 upon a vacancy in the first district, or (2) once a justice takes office in the new Orleans Parish district after being elected in the regular supreme court election held in the year 2000.
Finally, the amendments to SB 1255 provided that the legislation would be voided and of no effect if a consent decree in the Chisom case was not entered into in federal court. The Act would become effective on the governor's signature.
On June 2, 1992, the Senate committee approved SB 1255 as amended. The full Senate called the bill out of its regular order and passed it by a vote of 36 yeas, 2 nays, *247 and 1 abstention on June 4, 1992. The House and Governmental Affairs Committee held hearings on the bill on June 9, 1992. The House committee reported the bill favorably, and with only a technical amendment, by a 12-0-1 vote. The full House called SB 1255 out of its regular order and passed it on June 16, 1992 by a 85-14-6 vote. The Senate concurred in the House amendments by a vote of 38-0-1 on June 18, 1992. The bill was signed into law on June 22, 1992 by Governor Edwin W. Edwards and became Act 512.
On August 21, 1992, all parties involved in the Chisom case, as well as the federal district judge, signed a Consent Judgment in the United States District Court for the Eastern District of Louisiana. The district court's order stated that the Consent Judgment "memorializes" La. Acts 1992, No. 512 and effectively closed the Chisom case. That same day, the Fifth Circuit remanded the case to the federal district court to effectuate settlement. In October 1992, with the Consent Judgment having been approved, the Fifth Circuit dismissed the appeal in the Chisom case, which was on remand from the United States Supreme Court.

FACTS AND PROCEDURAL HISTORY
Clement F. Perschall, Jr., commenced the instant proceeding for declaratory relief in the Nineteenth Judicial District Court for the Parish of East Baton Rouge in January 1995. Specifically, the plaintiff filed a Petition for Declaratory Judgment on the Constitutionality of Act 512, praying that the Act be declared unconstitutional and void ab initio and for general and equitable relief. Petition at 1, Perschall v. Louisiana, No. 413714 (La. 19th J.D.C. Jan. 27, 1995). A resident and registered voter of Orleans Parish, plaintiff challenges the entirety of Act 512 on constitutional grounds, but his main complaint is with the enactment of La.R.S. 13:312.4 (the "Chisom seat"). Plaintiff claims the Act violates provisions of both the federal and state constitutions: (1) LA. CONST. art. 5, § 3 ("[T]he Supreme court shall be composed of a chief justice and six associate justices...."); (2) LA. CONST. art. 3, § 12 (prohibiting local and special laws); LA. CONST. art. 3, § 13 (requiring notice of intent to introduce certain local and special laws); U.S. CONST. amend. XIV and LA. CONST. art. 1, § 2 (both prohibiting denial of due process of law). In addition, plaintiff's Petition states that he, as a practicing attorney, is aggrieved as an attorney by Act 512 because the Act's constitutionality affects all decisions of this court during the time the Act is effective. Further, plaintiff complains his votes previously cast for justices are negated. Finally, plaintiff alleges that the legislature's failure to follow these constitutional provisions constitutes a denial of due process, equal protection, the right to vote, the ability to practice his trade, and the right to a representative and republican form of government, all of which are guaranteed by the federal and state constitutions.
The State removed the litigation to the United States District Court for the Middle District of Louisiana under the federal question jurisdiction of 28 U.S.C. § 1331. The case was transferred in due course to the Eastern District of Louisiana, the district court presiding over the Chisom Consent Judgment. Once before the federal court after removal, the State filed a motion to dismiss and/or for judgment on the pleadings on the issue of whether Act 512 is a local or general law. The federal court exercised Pullman-type abstention and remanded the case to state court on June 5, 1995, with a subsequent clarification order entered August 3, 1995.
Recognizing the "exceptional circumstances" presented by the case, the federal court determined that "submitting the plaintiff's novel state law claims to the expertise of a Louisiana court would respect the values of federalism highlighted in Pullman by avoiding premature constitutional adjudications, needless friction with state policies, and decision on unsettled questions of state law better resolved by state courts." Perschall v. Louisiana, No. 95-1265, 1995 WL 396311, *2 (E.D.La. July 5, 1995). Harkening principles of federalism and comity, the court abstained and clearly articulated the substance of the state issue to be addressed, if possible, on remand: the constitutionality vel non of Act 512. On motion by the State *248 to clarify its abstention order, the court stated: "Inherent in this Court's prior order and reasons was the expectation that once the Louisiana judiciary determined the state law constitutionality of Act 512, it will be for this Court to take whatever action is appropriate in accordance with the Voting Rights Act and federal jurisprudence, including determining the impact of that state court decision on the Chisom consent judgment." Minute Entry, Perschall v. Louisiana, No. 95-1265 p. 2 (E.D.La. July 31, 1995). Therefore, the state district court on remand was faced with an action seeking to have the Act declared "unconstitutional on all counts and void ab initio," Petition at 10, Perschall (No. 413714-A), but reserving the prayer for "general and equitable relief," id., and the federal issues.
After remand from the federal court, plaintiff propounded discovery requests on the State. The State sought and was granted extensions of time to answer discovery until the dispositive pre-trial motions, which were filed in federal court before abstention, were considered by the state court. In the meantime, the state trial court set a rule hearing for October 23, 1995 on the State's prior-filed Motion to Dismiss and/or for Judgment on the Pleadings.[10] At the October 23 hearing, the state district judge ordered the State's dispositive motion referred to the merits. In addition, the court ordered the State to answer plaintiff's interrogatories and requests for admissions and production within fifteen days of the hearing date. A written order apparently reflecting these oral rulings was entered on October 31, 1995. In late November 1995, the State moved to fix time within which to file a supervisory writ application to the first circuit. The district judge granted the State sixty days within which to file its application in a December 5, 1995 ruling. On January 31, 1996, the first circuit issued an order refusing to consider the State's writ because it was not timely filed. The appellate court stated the reason for the untimeliness was that the trial court's ruling date was October 23, and the State's application was filed more than thirty days after the trial court's ruling in open court. The court of appeal found that the procedural method by which the writ was handled was contrary to the Uniform Rules.[11]
While these proceedings were ongoing, the State filed in the trial court an exception of lack of subject matter jurisdiction, request for stay of discovery, and/or motion for protective order. In a January 17, 1996 written ruling, the trial court denied the State's exception and granted respondent's motion to compel the deposition of Chief Justice Pascal F. Calogero, Jr. and Associate Justice Walter F. Marcus, Jr.[12] Judgment, Perschall (No. 413714-A) (19th J.D.C. Jan. 17, 1996). The State then filed a second application in the first circuit requesting a stay of discovery. On January 31, 1996, the same day as the first circuit refused to consider the first writ application, the court refused to consider the stay request because the State failed to comply with the Uniform Rules.[13] These first circuit rulings necessitated the February 5, 1996 emergency request for stay of discovery and writ application in this court.
*249 This court ordered all proceedings stayed pending further court orders on February 15, 1996. On March 14, 1996, Chief Justice Pascal F. Calogero, Jr. and Associate Justices Walter F. Marcus, Jr. and Bernette Joshua Johnson voluntarily recused themselves from the case. After several applications for supervisory writs, this court on July 12, 1996 issued an Order requesting briefs on the issue of whether this court should respond to the federal district court's invocation of the abstention doctrine and whether the court should bypass lower courts at this point in the litigation. In consideration of this argument, and cognizant of "the importance of this case to the public and the orderly processes of government," we exercised our supervisory jurisdiction and granted certiorari, ordering the lower courts bypassed and the entire case brought to this court for argument and decision. 96-0322 (La.11/8/96); 1996 WL 659078. The court was particularly interested in the following:
1. Should the Louisiana court respond to the federal court's remand order if to do so would require rendition of an advisory opinion or of a declaratory judgment that will not terminate the uncertainty or controversy that gave rise to the proceeding that is, a judgment declaring that Act 512 violates the Louisiana Constitution unless saved by the federal consent decree?
2. Does the federal court's remand order constitute certification of a question of Louisiana law to the Supreme Court of Louisiana which has discretion to refuse such certified questions from the Supreme Court of the United States and the federal courts of appeals?
3. Does Act 512 violate the Louisiana constitution?
Id. On February 24, 1997, this court entertained oral argument, hearing from Perschall, the State, and the intervenor-Chisom plaintiffs.

ANALYSIS

Justiciability
Before we turn to an analysis of La. Acts 1992, No. 512, this court, as a threshold issue, must determine whether this case presents a sufficiently justiciable controversy post-abstention such that judgment may be rendered without issuance of merely an advisory opinion. The first two prongs of the Briefing Order, supra, concern important justiciability issues and necessitate a two-fold discussion: (1) whether essential state law questions are appropriately before the state judicial system upon a Pullman-type abstention order, and (2) if so, whether the matter remanded presents the state judicial system with a sufficiently justiciable controversy post-abstention.
We find the essential, unsettled state issues that prompted the federal district court to exercise Pullman-type abstention were properly remitted to the state court system because, inter alia, the record reflects no attempt by any party to appeal the federal court's remand order. In Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the Court concluded the abstention-based stay order was appealable as a "final decision" under 28 U.S.C. § 1291 because it put the litigants "`effectively out of court,'" id. at 11, n. 11, 103 S.Ct. at 934, n. 11 (quoting Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715 n. 2, 82 S.Ct. 1294, 1296 n. 2, 8 L.Ed.2d 794 (1962) (per curiam)), and because its effect was "precisely to surrender jurisdiction of a federal suit to a state court," id. at 11 n. 11, 103 S.Ct. at 934 n. 11.[14] Therefore, either litigant in the instant case could have lodged an appeal to the United States Court of Appeals for the Fifth Circuit upon entry of the district court's remand/stay order. Neither party in this case sought relief in the Fifth Circuit; therefore, neither can complain that the abstention order is defective either procedurally or on the merits. Rather, the only argument that can be made against reaching the merits on remand from the federal court's abstention order is that it presents the state system with a non-justiciable controversy *250 which the state courts are powerless to address jurisdictionally.
Notwithstanding the fact that unsettled state law issues were properly remanded as a procedural matter to the state court system by abstention, the question remains whether the issues remanded interpose questions that the state system has the discretion to refuse, similar to certified questions. In support of its abstention order, the federal district court observed the specific type of abstention ordered in this matter "is addressed to the inappropriateness of federal court resolution of difficult or unsettled questions of state law and the undesirability of reaching federal constitutional questions that might be mooted by application of state law." Perschall v. Louisiana, No. 95-1265, 1995 WL 396311, at *1-*2 (E.D.La. July 5, 1995). The court emphasized, "It is the combination of unresolved state law issues with the presence of a federal constitutional claim which makes the present case analogous to Pullman." Id. at *3 n. 2. This rationale is consistent with the abstention principles espoused by Pullman that a "federal court may, and ordinarily should, refrain from deciding a case in which state action is challenged in federal court as contrary to the federal constitution if there are unsettled questions of state law that may be dispositive of the case and avoid the need for deciding the constitutional question." 17A Wright, Miller & Cooper, FEDERAL PRACTICE & PROCEDURE, JURISDICTION 2D § 4242 (2d ed. 1988).[15] As recently as this term in Arizonans for Official English v. Arizona, ___ U.S. ___, ___ _ ____, 117 S.Ct. 1055, 1072-73, 137 L.Ed.2d 170 (1997), the Court reiterated that respect for the place of the States in our federal system calls for close consideration of the question of whether conflict is avoidable. The Court cautioned: "Warnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." ___ U.S. at ___, 117 S.Ct. at 1074.
Considering the essential unsettled state issue subject to Pullman-type abstention is whether Act 512 is constitutional, the federal court did in fact remit to state court the essential state issues, which, if answered, may be dispositive of the case and avoid the need for deciding the federal constitutional question. Therefore, it is apparent that this remand does not act as a veiled attempt at certification by a federal district court of a question of law to the Louisiana Supreme Court, a procedure not available in Louisiana.[16] Although "[c]ertification today covers territory once dominated by a deferral device called `Pullman abstention'," Arizonans for Official English, supra, ___ U.S. at ___, 117 S.Ct. at 1074, and has proved to be a more efficient method to allow novel state law questions to be put directly to the State's highest court, Pullman-type abstention is not a dead letter in light of certification. As the Court explained in Bellotti v. Baird, 428 U.S. 132, 151, 96 S.Ct. 2857, 2868, 49 L.Ed.2d 844 (1976), in clarifying its holding that a state statute's meaning should be determined by certifying the question to the state court, "Although we do not mean to intimate that abstention would be improper in this case were certification not possible, the availability of certification greatly simplifies the analysis." *251 Consequently, the Court has made it clear that "in marginal cases of Pullman-type abstention, where delay and expense might tip the scales against abstention of the traditional kind, it would be appropriate to use certification if that is available." 17A Wright, Miller & Cooper, supra, at § 4248. Thus, with the certification procedure not being a viable option in the instant case, we find the essential state law questions are properly before the state court system based upon a Pullman-type abstention order, because the remand/stay order was not appealed by either party, and, in any event, the facts and issues involved in this declaratory judgment action meet the requirements of Pullman-type abstention after careful review.
Our next concern centers on whether the instant case presents a sufficiently justiciable controversy in this post-abstention context. "It is well-settled that courts will not decide abstract, hypothetical or moot controversies, or render advisory opinions with respect to such controversies." Louisiana Associated General Contractors, Inc. v. State, 95-2105 p. 9 (La.3/8/96); 669 So.2d 1185, 1193. To avoid deciding abstract, hypothetical, or moot questions, courts require cases submitted for adjudication be justiciable, ripe for decision, and not brought prematurely. St. Charles Parish School Board v. GAF Corporation, 512 So.2d 1165 (La.1987). These traditional notions of justiciability are rooted in our constitution's tripartite distribution of powers into the executive, legislative, and judicial branches of government. LA. CONST. art. II, § 1. A concomitant limitation resulting from this structure is that "no one of these branches ... shall exercise the power belonging to either of the others." LA. CONST. art. II, § 2. "The judicial power is vested in a supreme court, courts of appeal, district courts, and other courts authorized by this Article." LA. CONST. art. V, § 1 (emphasis added). Part and parcel of the state judiciary's exercise of judicial power is the threshold requirement of a dispute, in the sense that adverse parties with opposing claims ripe for judicial determination are considered essential to the court's exercise of general jurisdiction. See Louisiana Independent Auto Dealers Association v. State, 295 So.2d 796 (La.1974); State v. Board of Supervisors, 228 La. 951, 84 So.2d 597 (1955).
Justice Tate grappled with the difficult issue of when a controversy is "justiciable" as opposed to a "merely advisory opinion" in Louisiana Independent Auto Dealers Association v. State, supra, 295 So.2d 796 (La. 1974). In Independent Auto Dealers, an unincorporated association of used-auto dealers and two individual members sought against the state a declaratory judgment to test the constitutionality of a provision of the Louisiana Consumer Credit Law, regulating motor vehicle transactions. Id. at 798. Overruling exceptions of no cause and no right of action, the trial court declared the Act unconstitutional under the state constitution. Id. The issue before this court was the propriety of the rendition of a declaratory judgment in this case and the trial judge's holding of unconstitutionality. Id. Despite an argument by the State that a judicial decision on that issue would essentially constitute an advisory opinion, the court deemed the action to be justiciable and proceeded to decide it on the merits.
The court recognized a justiciable controversy is essential to a cause to avoid issuance of merely an advisory opinion on a hypothetical or abstract set of facts, and that the declaratory judgment articles create a procedural device by which courts may make a declaration of rights without "executory or coercive relief." Id. at 798. Looking to Professor Edwin Borchard's definitive treatise on declaratory judgments, the court sought guidance for justiciability standards in the declaratory judgment context:
It is sufficient if a dispute or controversy as to legal rights is shown, which, in the court's opinion, requires judicial determinationthat is, in which the court is convinced that by adjudication a useful purpose will be served. The requisites of justiciability must be present.
....
Actions or opinions are denominated `advisory', when there is an insufficient interest in the plaintiff or defendant to justify judicial determination, where the judgment *252 sought would not constitute specific relief to a litigant or affect legal relations or where, by inadequacy of parties defendant, the judgment could not be sufficiently conclusive.
Id. at 798-99. Thus, Justice Tate concluded there must be sufficient interest on behalf of the parties plaintiff and defendant and sufficient adversity in order to properly interpose a justiciable controversy under the Louisiana declaratory judgment statutes.[17]
In Abbott v. Parker, 259 La. 279, 249 So.2d 908 (1971), this court addressed the "justiciable controversy" issue in the specific terms of a declaratory judgment action:
A `justiciable controversy' connotes, in the present sense, an existing actual and substantial dispute, as distinguished from one that is merely hypothetical or abstract, and a dispute which involves the legal relations of the parties who have real adverse interests, and upon which the judgment of the court may effectively operate through a decree of a conclusive character. Further, the plaintiff should have a legally protectable interest at stake, and the dispute presented should be of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.
249 So.2d at 918. The Abbott court's construction of the boundaries of "justiciable controversy" is also consistent with the action taken by the court in Stoddard v. City of New Orleans, 246 La. 417, 165 So.2d 9 (1964).
In Stoddard, this court declined to rule on the constitutionality of an industry promotion statute because the city had not taken any action to implement the statute, thus presenting the court with an abstract challenge. The court reasoned that "[b]asic to the exercise of [the declaratory judgment articles]... is the existence of a justiciable controversy," id., 165 So.2d at 11; moreover, "[t]he courts are without power to render advisory opinions on abstract questions." Id. The Stoddard court relied on Tugwell v. Members of the Board of Highways, 228 La. 662, 83 So.2d 893 (1955) (on rehearing), in which Justice Hawthorne aptly summarized the rationale behind this court's hesitancy to rule in the absence of a justiciable controversy:
[t]he question presented for judicial decision must be real and not theoretical, as courts do not give advisory opinions upon abstract questions. Therefore, a declaratory judgment action generally cannot be maintained unless it involves some specific adversary question or controversy asserted by interested parties and based on an existing state of facts, and a declaration of rights must be refused if the issue presented to the court is academic, theoretical, or based upon a contingency which may or may not arise.

Tugwell, 83 So.2d at 899.
More recently, the court has declined jurisdiction over issues posed in the abstract, or actions generally not involving specific adversarial questions asserted by interested parties and based on existing facts.[18] In American Waste & Pollution Control Co. v. St. Martin Parish Police Jury, 627 So.2d 158 (La.1993), the court vacated the trial court's holding of unconstitutionality on certain state statutes authorizing zoning, land use, and siting for solid waste disposal within parishes because the lack of sufficient adversity prevented a justiciable controversy finding. The court once again relied on the basic requirement of justiciability to avoid sitting in an advisory capacity. Likewise, in Church Point Wholesale Beverage Co. v. Tarver, 614 So.2d 697 (La.1993), the court declined to exercise jurisdiction over a challenge seeking recovery of taxes paid under the Beer Tax Statute. The court found the petitioners *253 lacked standing to seek declaratory relief because the refund claim had prescribed under applicable law. Therefore, the court refused relief because any opinion on the refund claim would be merely advisory for these parties.
It is argued this case is moot or otherwise non-justiciable because any judgment by this court can have no practical effect upon the existing controversy, thus constituting an advisory opinion. Based on the fact no "actual controversy" exists, the argument continues, this court should refuse making a declaration as to the Act because such "would not terminate the uncertainty or controversy giving rise to the proceeding." See La.C.C.P. art. 1876. We must disagree.
"If the case is moot, `there is no subject matter on which the judgment of the court can operate.'" St. Charles Parish School Board, supra, 512 So.2d at 1171 (citing Ex parte Baez, 177 U.S. 378, 390, 20 S.Ct. 673, 677, 44 L.Ed. 813 (1900)). A "moot" question connotes an issue that has been "deprived of practical significance" or "made abstract or purely academic." Louisiana Associated General Contractors, Inc., supra, 95-2105 p. 10; 669 So.2d at 1193; American Waste & Pollution Control Co., supra, 627 So.2d at 162. A "moot" case is one in which a judgment can serve no useful purpose and give no practical effect. Robin v. Concerned Citizens for Better Education in St. Bernard, Inc., 384 So.2d 405, 406 (La.1980).
The declaratory judgment articles are remedial in nature and must be liberally construed and applied so as to give the procedure full effect within the contours of a justiciable controversy. Stoddard, supra, 165 So.2d at 11. A court may declare the rights of parties in order to terminate an actual controversy[19] even if further relief is or could be claimed. La.C.C.P. arts. 1871 & 1875; Chauvet v. City of Westwego, 599 So.2d 294, 296 (La.1992) (per curiam).
The instant case is distinguishable from previous cases by this court wherein we found various actions were moot or lacked a justiciable controversy. The present controversy places before the state system questions ripe for decision, not premature or abstract. This judgment serves the useful purpose and gives the practical effect of terminating the uncertainty or controversy giving rise to the proceeding as far as the Louisiana state court system is able in this Pullman abstention context. In its abstention order, the federal district court recognized this effect, reasoning that submission of "plaintiff's novel state law claims to the expertise of a Louisiana court would respect the values of federalism highlighted in Pullman "and would "in all likelihood moot or substantially alter the plaintiff's single federal constitutional claim." Perschall v. Louisiana, No. 95-1265, 1995 WL 396311, *2 (E.D.La. July 5, 1995). That further relief "is or could be claimed" in federal court at this proceeding's conclusion provides no support for finding this case is moot. The basis for abstention, proper in this case, requires such a result.
We also find the facts presented in the instant abstention remand sufficiently present a justiciable controversy. This case addresses genuine rights between the parties, and it provides concrete relief by either (1) terminating the controversy completely by effectively mooting certain of the federal issues remaining if the Act were found constitutional, or (2) substantially altering the federal constitutional claim presently stayed in federal court if the Act were found unconstitutional.[20] Therefore, this case *254 presents the issues with sufficient adversity to satisfy the requisites of justiciability.[21] "The degree of adversity required to present the issues will vary from case to case, depending upon the issue presented." Louisiana Independent Auto Dealers, supra, 295 So.2d at 801. In this case, we are asked to declare whether Act 512 can survive under specific state constitutional provisions. The issue is purely legal. As in Louisiana Independent Auto Dealers, its resolution is not dependent upon the presentation of involved factual evidence. Id. Moreover, plaintiff's stated interests in conjunction with the State's duty to uphold the act represent truly adverse interests.[22]
For the foregoing reasons, we find this case presents a justiciable controversy in the wake of a Pullman abstention remand that is not moot. We turn now to the merits of plaintiff's claim that Act 512 is unconstitutional under the Louisiana Constitution.
Supreme Court Composition & Powers of Assignment
Article V, section 3 of the Louisiana Constitution of 1974 provides:
The supreme court shall be composed of a chief justice and six associate justices, four of whom must concur to render judgment. The term of a supreme court judge shall be ten years.
LA. CONST. art. V, § 3. The constitution currently provides that these seven seats be filled by election,[23] dividing the state into "at least six supreme court districts, and at least one judge shall be elected from each."[24] LA. CONST. art. V, § 4. The prior constitutional document, in effect for over six decades, also provided for a seven-justice[25] supreme court. Article VII, section 4 of the Louisiana Constitution of 1921 provided:
Except when judges of other courts are called in, as elsewhere provided in this Constitution, the Supreme Court shall be composed of a Chief Justice and six Associate Justices, four of whom shall concur to render judgment when the court is sitting en banc, and whenever so sitting, if four members cannot for any cause concur in any case, the court shall have authority to call on any judge of the Courts of Appeal, or District courts, whose duty it shall be, when so called upon, to sit in such case.
LA. CONST. art. VII, § 4 (1921).[26] Although the 1921 constitution increased the number *255 of justices allowed to sit on the supreme court from the five allowed in the Louisiana Constitution of 1913, the constitutional history of articles regulating the supreme court's composition reveals the 1921 and 1974 documents were consistent in continuing a numerative limit of justices on this court, a provision the origins of which date to the Louisiana Constitution of 1812.[27]
The 1974 Constitution also vested the supreme court, consistent with its general supervisory power over all other courts, with the authority to "assign a sitting or retired judge to any court...." LA. CONST. art. V, § 5(A). This simple, broad-based provision represented an evident change from the 1921 Constitution's distribution of assignment powers throughout various articles. The convention recognized the provisions for temporary assignment to the supreme court, as well as to and between the lower courts, were "unnecessarily detailed," Hargrave, supra, at 770; therefore, the redactors of the 1974 document omitted the various provisions and replaced them with the text of article V, section 5(A).
In determining the constitutionality of Act 512, which creates an additional seat on the Court of Appeal, Fourth Circuit and orders the judge duly elected to such seat assigned to the supreme court as a justice,[28] we are faced with conflicting constitutional provisions regarding supreme court composition: (1) article V, section 3's numerative limit of seven supreme court justices, and (2) article V, section 5(A)'s investiture in the supreme court of power to assign sitting or retired judges to any court.
"When a constitutional provision is clear and unambiguous, and its application does not lead to absurd consequences, it must be applied as written without further interpretation in search of its intent." Louisiana Associated General Contractors, Inc., supra, 95-2105 p. 15-16; 669 So.2d at 1196. Constitutional provisions should be construed so as to give effect to the purpose indicated by a fair interpretation of the language used, and in the event of conflict or inconsistency, provisions should be construed, if possible, to allow each provision to stand and be given effect. Eiche v. Louisiana Board of Elementary & Secondary Education, 582 So.2d 186, 189 (La.1991); State ex rel. Guste v. Board of Commissioners, 456 So.2d 605 (La.1984); Barnett v. Develle, 289 So.2d 129 (La.1974). If one constitutional provision addresses a subject in general terms, and another with the same subject in a more detailed way, the two should be harmonized if possible, but if there is any conflict, the latter will prevail. Arata v. Louisiana Stadium & Exposition District, 254 La. 579, 225 So.2d 362, 372 (1969), cert. denied sub nom. Schwegmann v. Louisiana Stadium & Exposition District, 396 U.S. 279, 90 S.Ct. 569, 24 *256 L.Ed.2d 467 (1970). Where a constitutional aim is evident and explicit from the language used, courts need not consider the historical basis for a constitutional prohibition and may not, by separately considering related constitutional provisions, arrive at a construction that detracts from the effectiveness or manifest meaning and purpose of the related provisions. Barnett v. Develle, 289 So.2d 129, 146 (La.1974).
The wording of article V, section 3, expressly imposing a numerative limit of supreme court justices, is clear and unambiguous and must be applied as written. By comparison to article V, section 5(A)'s assignment power, section 3 is the more specific provision concerning this court's composition. The constitutional aim is evident and explicit from the language used: There is a limit on the number of justices empowered to sit on this court. We may not, by separately considering the related constitutional provision authorizing this court to assign sitting or retired judges "to any court," arrive at a construction that defeats the manifest purpose and meaning of that power.
The State argues the additional judgeship created for the Court of Appeal, Fourth Circuit by enactment of La.R.S. 13:312.4 was properly ordered assigned to the supreme court pursuant to the court's power contained in article V, section 5(A). It contends the Chisom seat's assignment is similar to the temporary assignment of lower court judges to this court, arguing the power to assign judges to any court is "explicit and unfettered," relying on State v. Bell, 392 So.2d 442 (La.1981) and its progeny.
We agree with the State that the 1974 Constitution vested in this court plenary powers of assignment "to assist courts ... in the judicial branch in the furtherance of the administration of justice." Bell, 392 So.2d at 442. "This court's supervisory jurisdiction and assignment powers under the Constitution of 1921 were expressly retained and strengthened by the 1974 Constitution." Id. at 443. Moreover, we recognize this power authorizes assignment of lower court judges to any court, including this court. However, we must give the constitutional provisions in conflict herein a construction which will allow each to stand and be given effect, if possible. Although we agree the assignment power articulated by section 5(A) is express and plenary, the instant conflict with the numerative limit presents a circumstance in which the assignment power's full exercise leads to the absurd consequence of detracting from the more detailed or literal prohibition concerning this court's composition. Article V, section 3 is a clear and specific limitation, and the more general provision contained in article V, section 5(A) presents conflict. Nevertheless, in an effort to harmonize these provisions placed in conflict by the Act, we find it necessary, faced with these significant facts, to look to the intent behind the assignment power provision even though the more specific and detailed provision is usually held to prevail over a more general provision presenting conflict.[29]
We are aided in determining the purpose and scope of section 5(A)'s power by reviewing the powers distributed throughout the prior constitution. Although expressly continuing the numerative requirement present in prior constitutions, the 1921 Constitution detailed the supreme court's assignment power in no less than four separate articles. LA. CONST. art. VII, §§ 4, 5, 7, 12 (1921). The exception referred to in article VII, section 4 of the 1921 Constitution, as amended,[30] allowed the temporary assignment of lower court judges to the supreme court. This provision anticipated the need for this court, from time to time, to call temporarily on lower court judges for reasons such as illness or vacancy. Section 4 also allowed the supreme court to elevate lower court judges "if four members cannot for any cause concur *257 in any case."[31] Additionally, section 4 contemplated the extent of the assigned judge's power, stating the appointee's duty "shall be, when so called upon, to sit in any and all cases the court may direct." LA. CONST. art. VII, § 4 (1921), as amended (emphasis added).
The 1921 Constitution further authorized a system by which the court could sit in rotating divisions consisting of less than an en banc makeup. To facilitate this, the articles imposed a requirement different from the 1974 Constitution for concurrence in judgment,[32] authorizing the court to sit in three-judge panels; but to render judgment on the court's behalf, the constitution required complete unanimity among the three.
This divisional framework also contained a second assignment procedure that allowed two court of appeal judges to be elevated to the supreme court to form a third division "when necessary to dispose of a congested docket." Id. § 5. When these appellate court judges were called in, and the court was sitting en banc, which effectively enlarged the court to nine judges, the constitution required five judges to concur to render judgment. Id.
A third assignment procedure, contained in article VII, section 12, consisted of rules of assignment between and among the lower courts under certain circumstances. It gave the supreme court the power "to assign for any cause judges of one District Court to another District Court, and to provide for the interchange of judges of the District Courts," and it further allowed assignment of "District Judges to the Courts of Appeal whenever the judges of said Courts of Appeal are called to sit with the Supreme Court." LA. CONST. art. VII, § 12 (1921). A final assignment power provided for the filling of vacancies depending on the time remaining in a justice's term. See id. §§ 4, 7.
A clear purpose of the 1973 Constitutional Convention was to simplify the state's constitution.[33] As it relates to the judiciary article, "a desire to present a drastically shortened article on the judiciary" was consistent with that general mission. Hargrave, supra, at 768. To accomplish that goal, the committee proposed to the convention a simply worded provision which consolidated all of the powers of assignment vested in the supreme court by the 1921 Constitution in a single article. In explaining this revision to the convention, the judiciary committee chairman summarized that the provision "allowing the *258 Supreme Court to assign a sitting or retired judge to any court is not a change in the law.... This power is granted the Supreme Court in the present constitution." 6 RECORDS OF THE LOUISIANA CONSTITUTIONAL CONVENTION OF 1973: CONVENTION TRANSCRIPTS 721 (La. Constitutional Convention Records Comm'n ed., 1977)
In the course of revising the assignment power provisions, however, the 1973 convention suppressed the authorization for the court to sit in divisions. Although an early committee working draft would have permitted the court to sit in divisions, Hargrave, supra, at 768 (citing Draft A, § 4), the supreme court did not use this reserved power with the exception of two years immediately following the adoption of the 1921 constitution. Id.; LA. ST. L. INST., 2 PROJET OF A CONSTITUTION FOR THE STATE OF LOUISIANA 596 (1954). Therefore, the convention's judiciary committee, consistent with the Law Institute proposal contained in the PROJET, 2 PROJET, supra, at 596, did not carry forward that authorization to the convention.
From this review, we are convinced the section 5(A) assignment power, extended from the 1921 Constitution, is a plenary power intended to assist this court in supervising an "efficient judicial administration of the statethe best efficient use of the manpower." CONVENTION TRANSCRIPTS, supra, at 731 (quoting Justice Tate debating the merits of article V, § 5(A)). Additionally, in convention floor debates, Justice Tate clarified the power's general purpose: "[T]he assignment power is used in temporary situations .... [t]o permit temporary assignment without the expenses of creating a permanent new position, when it is only a temporary situation needing temporary help, or a sick judge for instance." CONVENTION TRANSCRIPTS, supra, at 724. Therefore, it is apparent the power to assign judges temporarily to this court or any lower court under our supervisory jurisdiction is broad, but always was intended to effectuate temporary assignment, as that term is generally understood, which judge would serve at this court's direction under our supervisory jurisdiction.
With regard specifically to the power of assignment to this court under the 1974 Constitution, we find two actions of the convention particularly significant. First, as a general proposition, the judiciary committee intended no change in the law concerning the assignment power from the prior constitution. Secondly, the convention, consistent with the PROJET before it, suppressed in the 1974 document the prior authorization allowing this court to sit in rotating divisions, which process actually authorized the court to exceed its numerative limit under certain circumstances articulated in article VII, section 5 of 1921.

Application to the Act
Act 512 enacted the Chisom seat through La.R.S. 13:312.4. Section 312.4(C) provides:
Pursuant to Article V, Section 5(A) of the Constitution of Louisiana, the judge provided for in Subsection A shall be immediately assigned to the Louisiana Supreme Court. While assigned to the supreme court, the judge shall participate and share equally in the cases and duties of the justices of the supreme court during the period of the assignment. Further, the judge shall receive the same compensation, benefits, expenses, and emoluments of office as are now or as may hereafter be provided by law for justices of the Louisiana Supreme Court.
La.R.S. 13:312.4 (C). Section 312.4 (A) created an additional judgeship for the Court of Appeal, Fourth Circuit, id. § 312.4 (A), and instructed that an election to fill the judgeship take place in the first district of the fourth circuit in 1992.[34]Id. § 312.4 (B). By ordering the judge duly elected under the act assigned immediately to the supreme court pursuant to article V, section 5 (A), the Act envisioned an assignment for as many as seven years, until a justice was elected in the newly created district composed solely of Orleans Parish. Id. § 312.4 (D); see id. § 101.1 (A) (creating Orleans Parish district). The section does not limit the assigned judge *259 to a typical temporary appointment, for instance, "to sit on any and all cases as the court may direct" as the progenitor of the article V, section 5(A) power provided. See LA. CONST. art. VII, § 4 (1921), as amended. Rather, section 312.4 charges the assigned judge "shall participate and share equally" in all of the cases, duties, and benefits of office as are afforded "the justices of the supreme court during the period of the assignment." La.R.S. 13:312.4 (C).
It is apparent from a plain reading of section 312.4 that the legislature was attempting to effectuate an immediate remedy of alleged voting rights violations by providing a majority-minority appellate court district, with concomitant assignment of the duly elected judge to the supreme court, to serve in the full capacity of a justice during the period assigned. We recognize this course of action was undertaken in good faith to effectuate a remedy least injurious to the institution, at a point in time when the voting rights jurisprudence was in transition. However, section 312.4's implementation effectively created an eighth position on this court, implicating state constitutional concerns. While meant to be temporary, section 312.4 has administered a process that we must find is constrained by article V, section 3's numerative limit.
Section 312.4 contemplated a construction of this court's assignment power that we are unable to supply. Considering the intent behind the 1974 revisions, the historical boundaries of the power, and the conflict it presents with a specific limiting provision concerning this court's composition, we find it impossible to harmonize article V, section 3 with article V, section 5(A), so as to give full effect to the more specific numerative requirement in light of the Act's clear purpose. The Act's very language instructs the assigned judge shall serve in the full capacity of a justiceequal in responsibilities and benefits, and unhindered by the court's supervisory jurisdiction. However, the power of temporary assignment to this court, both today and historically, has constrained the appointee's power in the sense that the judge assigned serves at the direction or pleasure of this court. Clearly, section 312.4 intended no such limitation on the Chisom seat. However, that limitation of the assigned judge's power has been a corollary to this court's assignment power over the course of several constitutional revisions, and remains so today. A genuine construction of section 5(A), which gives full effect to the power and implements its purposes, reveals the type of assignment confected by section 312.4 was beyond that which was contemplated by the redactors. Therefore, we must hold the Act unconstitutional under article V, section 3, insofar as it effectively imposes an eighth justice on the supreme court by the provisions of La.R.S. 13:312.4.

Severability
We do not lightly consider constitutional challenges to enactments by the Louisiana Legislature. For some time, we have approached such review by initially affording the legislation some measure of deference when faced with attack. We have facilitated this by allowing questionable legislative acts a presumption of constitutionality, which may be turned back by a plaintiff's showing of specific constitutional infirmities. Brown v. State, Department of Public Safety & Corrections, 96-2204 p. 2 (La. 10/15/96); 680 So.2d 1179, 1180.[35] The specific problem warranting invalidation of that part of the act that created La.R.S. 13:312.4 was the explicit limitation on this court's composition contained in article V, section 3 of the Louisiana Constitution. Having found the Act unconstitutional in part, we turn our attention to whether the remaining portion of the act is severable and therefore constitutional.
The unconstitutionality of one or more portions of a law does not render the entire law unenforceable if the remaining portions are severable from the offending portions. Police Association of New Orleans v. City of New Orleans, 94-1078 p. 19 (Lack/ 17/95); 649 So.2d 951, 965. In Louisiana *260 Associated General Contractors, Inc., supra, 95-2105 p. 22; 669 So.2d at 1201, this court summarized the requisite elements of a severability analysis:
The test for severability is whether the unconstitutional portions of the law are so interrelated and connected with the constitutional parts that they cannot be separated without destroying the intention of the legislative body enacting the law. Police Association, id.; Polk v. Edwards, 626 So.2d 1128, 1148 (La.1993). To be capable of separate enforcement, the valid portion of an enactment must be independent of the invalid portion and must form a complete act within itself. The law enforced after separation must be reasonable in light of the act as originally drafted. The test is whether the legislature would have passed the statute had it been presented with the invalid features removed. Succession of Lauga, 624 So.2d 1156, 1171-72 (La.1993). Where the purpose of the statute is defeated by the invalidity of part of the act, the entire act is void. Conversely, however, when the general objectives of the act can be achieved without the invalid part, the remaining parts of the act will be upheld. Polk, id.; Lauga, id.

Generally, the Act's remaining provisions (1) created a permanent majority-minority supreme court district that would become effective upon certain contingencies, but no later than January 2000, La.R.S. 13:101.1 (A); (2) instructed the legislature to reapportion the supreme court into seven districts according to law and applicable census data in the 1998 regular session, id. § 101.1 (B); (3) provided for the effectiveness of the new Orleans Parish district upon a vacancy in the first supreme court district, id. § 101.1 (C); and (4) provided that each justice holding office on the Act's effective date shall not be affected by its provisions, and extended the benefits provided in La. R.S. 11:558 (A)(5)(a)(ii) to each justice. Id. § 101.1 (D).
The legislature is completely within its authority, for example, to reapportion supreme court districts, LA. CONST. art. V, § 4, or provide for retirement benefits, id. § 23, within the confines of constitutional constraints, as the remaining part of the Act attempted. However, we do not believe, given its interrelation with La.R.S. 13:312.4, the legislature would have passed La.R.S. 13:101.1 into law had it been presented in an act with the Chisom seat's provisions removed. Section 312.4 expressly references section 101.1 in its provisions concerning the Chisom seat's expiration. Moreover, the impetus of the Act was a comprehensive remedyan immediate response set forth in section 312.4 followed by a more permanent resolution contained in section 101.1. The unconstitutional portions of the Act having to do with the Chisom seat cannot be separated without destroying the intent of the legislature in enacting the law. We find the remaining portions of the Act are not severable; therefore, the entire Act is unconstitutional.

Effect of Judgment
We realize that Act 512 does not exist in a vacuum. The State argues, and we agree, the Act and the Chisom Consent Judgment are separate and independent methods by which the negotiated remedy was implemented. Although the Act falls by this judgment, we recognize the status quo remains intact under the Chisom Consent Judgment. Consequently, this court as it is currently composed shall continue to function as a de jure court with its actions valid and effectual. We emphasize that the court-approved settlement in Chisom, which is under the jurisdiction of the United States District Court for the Eastern District of Louisiana, is not affected by this judgment.
Finally, we must address an allegation of the plaintiff that has profound importance to the public and the state judicial system. Plaintiff argues a declaration that Act 512 is unconstitutional renders void all decisions by this court decided during the time the Act was effective. By applying long-established authority, we reject this contention.
In State v. Johnson, 249 La. 950, 192 So.2d 135 (1966), defendants contested their convictions and sentence on appeal, arguing they were prejudiced by an unfair trial and for numerous other errors related to their murder charges. In addition, defendants contended the criminal statutes applied to them *261 were unconstitutional and their prosecutions invalid because those laws were passed by an improperly constituted legislature. LA. CONST. art. III, sections 2 and 3 of 1921 required the legislature to reapportion itself every ten years. The defendants argued that since the legislature failed to do so, its actions while ill-constituted required invalidation of its enactments.
A unanimous court in Johnson repudiated that argument by applying the "de facto" officer doctrine. The court reasoned that if the legislators who enacted the challenged laws were not de jure officers, they were at a minimum "de facto public officers." Id., 192 So.2d at 145. Grounded in public policy, the court found the "acts of a de facto officer are valid as to third persons and the public until the officer's title to office is adjudged insufficient." Id. Meanwhile, the officer's authority may not be collaterally attacked or inquired into by third persons, and their actions are clothed with the same validity as that of de jure officers. Id. at 146. Therefore, the court concluded the defendants could not avail themselves of the legislature's failure to reapportion itself to avoid prosecution. Id.
In State v. Stripling, 354 So.2d 1297 (La.1978), the court reaffirmed this principle. In Stripling, defendants challenged their convictions and sentences, arguing the Commissioner who authorized the challenged search warrant was without authority to issue the warrant because the legislative act creating the Commissioner's position was unconstitutional. Id. at 1300. The defense argued the act to create the office did not pass with the requisite two-thirds of the membership of the House of Representatives as required by LA. CONST. art. 87 of 1921; therefore, the warrants served against them were unlawful. Id.
Relying on Johnson, the court held the commissioner issuing the warrant was at least a de facto officer acting under color of authority. Id. The court reasoned that until the commissioner's title to the office is directly attacked and held to be invalid, the acts of a de facto official "are as valid and effectual[] when they concern the public or the rights of third parties, as though he were an officer de jure and cannot be collaterally attacked." Id. at 1300-01. Thus, the court refused to invalidate the defendants' convictions and sentences on that basis.
This court applied the de facto officer doctrine directly to the judiciary in City of Baton Rouge v. Cooley, 418 So.2d 1321 (La. 1982). In Cooley, defendants were charged with traffic offenses and appeared before an ad hoc judge assigned to the Baton Rouge City Court. Defendants challenged the jurisdiction of the ad hoc judge, arguing the appointment made by a duly elected City Court judge was unconstitutional under LA. CONST. art. V, section 22. The lower courts denied defendants motion to upset the ad hoc judge's jurisdiction and this court affirmed.
In maintaining the ad hoc judge's jurisdiction, this court reiterated many of the de facto officer principles articulated in State v. Johnson, supra. A judge acting under color of right has the authority, capacity, and right to perform judicial duties. Id. (citing State v. Lewis, 22 La.Ann. 33 (1870)). That capacity cannot be challenged collaterally, and the acts of a de facto judge, even if not de jure, are valid and binding. Id. (citing State v. Schuermann, 146 La. 110, 83 So. 426 (1919)).
Like in Cooley, the judge elected to occupy the Chisom seat under La.R.S. 13:312.4 is not a usurper of an office who acted without color of right. Rather, that judge's actions have been and will be given de jure effect under the Chisom Consent Judgment. At a minimum, the actions of the judge assigned pursuant to section 312.4 have been in the nature of a de facto officer with a judicial appointment made in conformity with a statute passed by the Louisiana Legislature. Therefore, all action of this court undertaken while that judge has been and continues to be assigned pursuant to the Consent Judgment shall be valid and effectual and not subject to attack.
Based upon the foregoing, we reject plaintiff's allegation that actions taken by this court during the Chisom seat's assignment pursuant to Act 512 are defective. This court's actions are valid and effectual under well-settled law.

*262 CONCLUSION
For these reasons, Act 512 is hereby declared unconstitutional in its entirety. We recognize the status quo shall remain intact, and this court, as it is currently composed and operating, shall continue to function as a de jure court under the Chisom Consent Judgment, which decree is under the continuing jurisdiction of the United States District Court for the Eastern District of Louisiana.
It is so ordered.
FREDDIE PITCHER, Jr., J. Ad Hoc., dissents and assigns reasons.
FREDDIE PITCHER, Jr., Justice Ad Hoc, dissenting.
I respectfully dissent.
I first quarrel with the majority's decision to reach the merits in this case by very adroitly finding that the Pullman abstention doctrine overrides this court's long-standing policy of not giving advisory opinions. I also disagree with the majority's determination that Act 512 is an unconstitutional enlargement of the supreme court.
In determining the constitutionality of Act 512, the majority noted that Act 512 created a conflict between article V, § 3's numerative limit of seven supreme court justices and article V, § 5(A)'s investiture in the supreme court of power to assign sitting or retired judges to any court. In its attempt to harmonize these provisions, the majority reviewed the constitutional history behind this court's assignment power set forth in article V, § 5(A) and concluded that "the power to assign judges temporarily to this court or any lower court under its supervisory jurisdiction is broad, but always was intended to effectuate temporary assignment, as that term is generally understood, which judge would serve at this court's direction under our supervisory jurisdiction."
I see no such limitation on this court's power to assign judges. As noted by the majority, in State v. Bell, 392 So.2d 442, 442-443 (La.1981), this court stated as follows:
The court's power to assign judges to assist courts other than their own within the judicial branch in furtherance of the administration of justice is explicit and unfettered. Article 5, § 5(A) of the Louisiana Constitution of 1974 provides without qualification that the Supreme Court `may assign a sitting or retired judge to any court.' All efforts to limit this plenary power during the 1973 constitutional convention were decisively rejected. STATE OF LOUISIANA CONSTITUTIONAL CONVENTION OF 1973 Verbatim Transcripts August 15, 1973 at 50-76. This court's supervisory jurisdiction and assignment powers under the Constitution of 1921 were expressly retained and strengthened by the 1974 Constitution. See Hargrave, The Judiciary Article of the Louisiana Constitution of 1974, 37 La.L.Rev. 765, 786 et seq. (1977). (Footnote omitted).
See also State v. Petterway, 403 So.2d 1157 (La.1981).
Furthermore, I do not believe that Act 512 effectively imposes an eighth justice on the supreme court. Section 312.4 does nothing more that establish an additional judgeship for the Court of Appeal for the Fourth Circuit, to temporarily increase the number of judges for the court of appeal for the circuit to thirteen judges.
The assignment of a judge who is elected to the Fourth Circuit Court of Appeal to the supreme court for a period of time not to exceed seven years is in accord with this court's power under Article V, § 5(A).
NOTES
[*] Chief Judge Charles A. Marvin, Court of Appeal, Second Circuit, and Judge Freddie Pitcher, Jr., Court of Appeal, First Circuit, participating as associate justices ad hoc. Calogero, C.J., and Marcus and Johnson, JJ., recused. Panel composed of Lemmon, Kimball, Victory, Traylor, and Knoll, JJ., and Marvin and Pitcher, JJ. ad hoc. posed of Lemmon, Kimball, Victory, Traylor, and Knoll, JJ., and Marvin and Pitcher, JJ. ad hoc.
[1] Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) (Frankfurter, J., for a unanimous Court).
[2] 42 U.S.C. 1973, as amended ("Section 2"). As amended in 1982, section 2(a) prohibits the imposition of a voting qualification or prerequisite or standard, practice, or procedure that "results in a denial or abridgment of the right ... to vote on account of race or color," and section 2(b) states that the test for determining the legality of such practice is whether, "based on the totality of circumstances," minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."
[3] The United States intervened on the Chisom plaintiffs' behalf after the case was remanded to the district court. The government's complaint in intervention alleged the first supreme court district's multimember election scheme constituted a "standard, practice or procedure" that resulted in an abridgment of the right to vote on account of race or color in violation of Section 2.
[4] The Court confronted the 1982 amendments to Section 2 for the first time in Gingles, articulating a three-part test to be considered in evaluating a Section 2 claim. The minority group must be able to demonstrate (1) that it constitutes a sufficiently large and geographically compact unit that warrants a single-member district; (2) that it is politically cohesive; (3) that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. Gingles, 478 U.S. at 49-53, 106 S.Ct. at 2766-67.
[5] The district court's ruling on the constitutional claims was not appealed. Therefore, the only remaining issue before the Fifth Circuit on appeal was the district court's disposition of the Voting Rights Act claims. Chisom v. Roemer, 917 F.2d 187, 188 (5th Cir.1990) (per curiam).
[6] The LULAC plaintiffs alleged in part that (1) the at-large electoral scheme for state district court judges diluted the voting strength of minorities in violation of Section 2, and (2) this dilution could be remedied by alternative electoral schemes using, for instance, electoral subdistricting or modified at-large districts. As in Chisom, the Court granted review solely to consider the issue of Section 2's scope. Houston Lawyers' Assn. v. Attorney General of Texas, 501 U.S. 419, 425, 111 S.Ct. 2376, 2380, 115 L.Ed.2d 379, 386 (1991).
[7] With regard to the new Orleans Parish district, section 101.1 specifically provided that if a first district vacancy occurred after the 1998 reapportionment but before January 1, 2000, the special election to fill the vacancy would occur in the Orleans district.
[8] The retirement benefits authorized by La.R.S. 11:558 (A)(5)(a)(ii) are also known as "Act 1063" benefits, referring to La. Acts 1991, No. 1063.
[9] The judge first elected to fill the seat authorized by section 312.4 was the Honorable Revius O. Ortique, Jr, and its current occupant is the Honorable Bernette Joshua Johnson.
[10] Also set for the October 23, 1995 rule hearing was plaintiff's motion to vacate the discovery extension, motion to compel discovery, and motion for sanctions.
[11] The court of appeal found that because the trial court rulingthe referral of a motion to dismiss and/or for judgment on the pleadings to the trial on the meritswas interlocutory in nature, the ruling date for the purpose of timely filing a writ was the trial court's oral ruling date of October 23, 1995. The court stated: "The rule is not complied with by obtaining a signed judgment and filing the motion and order for a return date within 30 days of signing of the judgment, and receiving an extended return date outside of the 30 day period as was done in this case."
[12] Chief Justice Calogero and Justice Marcus are the current occupants of the two seats allotted to the first supreme court district, which was the focus of challenge in Chisom. Both judges were intervenors in the Chisom litigation, and their counsel were signatories of the Chisom Consent Judgment. Justices Calogero and Marcus have held the office of justice from the first district since January and March of 1973, respectively.
[13] The court of appeal found the State's application did not contain sufficient documentation in support of its request to warrant consideration under the Uniform Rules of the Courts of Appeal. For instance, the application failed to include documentation of the date set by the trial court for filing the application in regard to the January 17, 1996 judgment.
[14] The Court recently reaffirmed this principle in Quackenbush v. Allstate Ins. Co., ___ U.S. ___, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996).
[15] In Growe v. Emison, 507 U.S. 25, 32 n. 1, 113 S.Ct. 1075, 1080 n. 1, 122 L.Ed.2d 388 (1993), the Court opined in dicta that Pullman-type abstention would more clearly be characterized Pullman "deferral." The Court explained that Pullman deferral recognizes that federal courts should not prematurely resolve the constitutionality of a state statute, id., "when a constitutional issue in the federal action will be mooted or presented in a different posture following conclusion of the state-court case." 507 U.S. at 32, 113 S.Ct. at 1080; see also Baggett v. Bullitt, 377 U.S. 360, 376-77, 84 S.Ct. 1316, 1325, 12 L.Ed.2d 377 (1964) (observing Pullman abstention was designed especially for this sort of narrowing construction).
[16] Louisiana statutory law provides a procedure by which the Supreme Court of the United States and the federal circuit courts of appeals can certify questions or propositions of state law, which are determinative of a cause, to the Louisiana Supreme Court, where there is no clear or controlling precedent in state high court decisions. See La.R.S. 13:72.1. This court has complete discretion on whether to answer such questions. Federal district courts are not permitted to certify questions under this procedure. See id.
[17] See also St. Charles Parish School Board, supra, 512 So.2d at 1171, defining "justiciable controversy" as an "existing actual and substantial dispute, as distinguished from one that is merely hypothetical or abstract, and a dispute which involves the legal relations of the parties who have real adverse interest, and upon which the judgment of the court may effectively operate through a degree of conclusive character."
[18] But see, e.g., Arata v. Louisiana Stadium & Exposition District, 254 La. 579, 225 So.2d 362 (1969) (financing and construction of domed stadium); Walker v. Louisiana Expressway Authority, 274 So.2d 716 (La.App. 4th Cir.), writ denied, 277 So.2d 447 (La.1973) (proposed construction of toll road) seeking to resolve validity of legislative enactments by institution of suits by "friendly" plaintiffs to obtain prospective judicial determination.
[19] Given the construction afforded the declaratory judgment articles and its remedial nature, a proceeding for declaratory judgment must be based on an "actual controversy," which term is to be given a broad construction. In re Cooper, 57 So.2d 775, 776 (La.App. 1st Cir.1952).
[20] In its Order and Reasons for exercising Pullman abstention, the federal court made clear:

A state court's determination that Act 512 violates Louisiana law would in all likelihood moot or substantially alter the plaintiff's single federal constitutional claim.... By abstaining from deciding the state constitutional issues, the Court does not undermine the substantial federal interest in determining the constitutionality of Act 512. Such an interest clearly exists since the validity of the Consent Judgment entered by this Court in the Chisom case rests on a determination of the viability of the aforesaid act under the Louisiana Constitution. Perschall v. Louisiana, No. 95-1265, 1995 WL 396311, *2 (E.D.La. July 5, 1995).
[21] From the record, there is no indication that this litigation was brought by a friendly plaintiff, see supra note 18, or that plaintiff, the State, and the intervenors-Chisom plaintiffs are insufficiently contesting the Act's constitutionality on the merits.
[22] The State and intervenors-Chisom plaintiffs additionally were parties to the federal litigation that prompted Act 512's passage, as well as parties to the Consent Judgment that followed the Act's passage and made the Act effective.
[23] LA. CONST. art. V, § 22(A) ("Except as otherwise provided in this Section, all judges shall be elected."). Section 22 also provides for the filling of judicial vacancies by special election called by the governor or supreme court assignment depending on the remaining time of an existing term. Id. § 22(B).
[24] "This provision allows the legislature to provide for single member supreme court districts. However, until such action, the existing six districts are maintained, five districts electing one judge from each, and the First District, composed of Orleans, Plaquemines, St. Bernard and Jefferson Parishes, electing two members to the court." W. Lee Hargrave, The Judiciary Article of the Louisiana Constitution of 1974, 37 LA. L.REV. 765, 768-69 (1977). Article VII, section 9 of the 1921 Constitution fully states the parishes included in each supreme court district, which districts were retained by the 1974 document. LA. CONST. art. V, § 4. Of course, the 1974 Constitution authorizes the legislature to change the composition of these existing districts by a two-thirds vote of the elected membership of each house of the legislature. Id. Attempts on the convention floor to require seven single-member districts were defeated, vesting the legislature with reapportionment duty. Hargrave, supra, at 769.
[25] "The constitution makes no technical distinction between the terms `justice' and `judge.' While [LA. CONST. art. V, § 3], in the first sentence, does use the term `justice,' the second sentence of the section, as well as subsequent sections, refers to a member of the supreme court as a `judge.'" Hargrave, supra, at 768 n. 7; see generally LA. CONST. art. V, §§ 2, 4, 6, 22-24.
[26] Article VII, section 4 was amended in 1948 to allow the court the power to assign appellate or district judges to this court in cases of illness or vacancy which the court was not otherwise authorized to fill. This language was necessary to authorize temporary assignment for these purposes because section 4 only authorized such assignments if four justices could not "for any cause concur in any case." The amended version of article VII, section 4 provided:

Except when judges of other courts are called in, as elsewhere provided in this Constitution, the Supreme Court shall be composed of a Chief Justice and six Associate Justices, four of whom shall concur to render judgment when the court is sitting en banc, and whenever so sitting, if four members cannot for any cause concur in any case, or in case of illness of any justice causing his absence for more than two weeks, or during any vacancy in the office of any justice which the court is not authorized to fill, the court shall have authority to call on any judge of the Courts of Appeal, or District Courts, whose duty it shall be, when so called upon, to sit in any and all cases the court may direct.
LA. CONST. art. VII, § 4 (1921), amended by La. Acts 1948, No. 515, adopted Nov. 2, 1948. The amended version of section 4 also more clearly stated that when assigned, the appointee shall serve in any cases as "the court may direct." Id.
[27] LA. CONST. art. 86 (1913) ("The Supreme Court shall be composed of one Chief Justice and four Associate Justices...."); LA. CONST. art. 86 (1898) (same); LA. CONST. art. 82 (1879) (same); LA. CONST. art. 75 (1868) (same); LA. CONST. art. 71 (1864) (same); LA. CONST. art. 63 (1852) (same); LA. CONST. art. 64 (1845) ("The supreme court shall be composed of one chief justice and three associate justices...."); LA. CONST. § 3 (1812) ("The supreme court shall consist of not less than three judges, nor more than five....").
[28] While the power of the legislature to require this court to exercise its assignment power in a certain way was raised in brief as a questionable exercise under the separation of powers doctrine, we pretermit discussion of the issue in light of our ultimate resolution.
[29] When resorting to intent behind constitutional provisions, proceedings in the constitutional convention which drafted the constitutional provisions in question are valuable aids, and should be given some weight, in determining the purpose, intent, and consequent meaning of those provisions. New Orleans Firefighters Association v. Civil Service Commission of the City of New Orleans, 422 So.2d 402, 407 (1982).
[30] See supra note 26.
[31] This language is consistent with assignment power language contained in earlier constitutions. LA. CONST. art. 89 (1913) ("Whenever three members cannot concur in any case, in consequence of recusation of any member or members of the court, or for any other cause, the court shall have authority to call on any judge or judges of the Courts of Appeal, or District Courts, whose duty it shall be, when so called upon, to sit in such case.") (articulating recusation as a reason for ad hoc assignment, but relegating reasons such as illness to coverage under the "any other cause" language); LA. CONST. art. 89 (1898) (same); LA. CONST. art. 85 (1879) ("Whenever three members cannot concur, the judges not recused shall have authority to call upon any judge or judges of the district courts, whose duty it shall be, when so called upon, to sit in the place of the judge or judges recused, and to aid in the determination of the case.") (allowing ad hoc assignment power only in the circumstance of recusal); LA. CONST. art. 81 (1868) (same); LA. CONST. art. 74 (1864) ("Whenever the majority cannot agree, in consequence of the recusation of any member of the court, the judges not recused shall have the power to call upon any judge or judges of the inferior courts, whose duty it shall be, when so called upon, to sit in the place of the judge of [sic] judges, and to aid in determining the case."); LA. CONST. art. 70 (1852) (same); LA. CONST. of 1845 (providing no assignment power); LA. CONST. of 1812 (same).
[32] The 1974 constitution does not explicitly require full court participation to render judgment; however, article V, section 3 does require that four justices "must concur to render judgment." LA. CONST. art. V, § 3, cl. 1. The corresponding requirement of the 1921 constitution provided that four justices "shall concur to render judgment when the court is sitting en banc." LA. CONST. art. VII, § 4 (1921). The "en banc" language was necessary in the 1921 document because the redactors included provisions for allowing the court to sit in divisions, in which three justices constituted a quorum and were required to unanimously concur to render judgment. See id. § 5, cl. 1.
[33] Indeed, the 1946 legislature anticipated this need to simplify the state's constitution by ordering a projet for a new constitution. See LA. ST. L. INST., 1 PROJET OF A CONSTITUTION FOR THE STATE OF LOUISIANA, at xix (1954). The PROJET, for example, was "less than one-seventh the length of the [1921] constitution." Id. at xxv.
[34] "The parish of Orleans shall compose the first district of the fourth circuit...." La.R.S. 13:312 (4)(b).
[35] In view of this presumption, judicial self-restraint is appropriate when statutes are under constitutional attack. Sherman v. Cabildo Construction Co., 490 So.2d 1386, 1390 (La.1986); Dow Hydrocarbons & Resources v. Kennedy, 96-2471 p. 9, 694 So.2d 215 (La. 5/20/97) (Kimball, J., concurring).