ON REMAND FROM THE SUPREME COURT

liMURRAY, Judge.
This case is before us on remand from the Supreme Court. Plaintiff, Edward Ferrell, was injured on August 12, 1985, when his Toyota[1] hit an unmarked police car that was stopped in the left lane of traffic, and was then hit by a Cadillac driven by Antoine Paudice. The police car, operated by Officer Reid Noble, was parked in the left hand lane of traffic behind a Chevrolet, driven by Kim-mie Cranford, who had stopped to offer assistance to Ms. Patrice Brown, the driver of a Mazda that had spun out of control, struck the left hand guard rail and come to rest facing traffic in either the left-hand lane of traffic or on the shoulder.[2]
|2The Supreme Court set forth the history of this litigation in its opinion:
... Mr. and Mrs. Ferrell sued the drivers and insurers of the other five vehicles. Paudice sued the drivers and insurers of the others, including Ferrell, one of the plaintiffs in this lawsuit.
Prior to trial, the Ferrells settled their claims against Paudice, Noble, and the City of New Orleans. There remained for trial their claims against Brown and her insurer, Fireman’s Fund, and against Cranford and his insurer, Liberty Mutual, and Enterprise Leasing who leased the car to Cranford. At the conclusion of trial, the jury found that Brown and Cranford were not negligent, that Noble was negligent and was a proximate cause of the accident, that Ferrell was negligent but was not a proximate cause of the accident, and that Paudice was negligent and a proximate cause of the accident. The jury apportioned fault as follows: 0% to Brown and Cranford; 20% to Noble; 30% to the phantom; 30% to Ferrell; and 20% to Paudice.
Ferrell at pp. 2-3, 650 So.2d at 744-745.
This Court affirmed the jury’s decision. The Supreme Court granted certiorari and affirmed the judgment as to the finding that Mr. Cranford was not at fault. It, however, reversed the judgment with regard to the finding that Ms. Brown was not at fault. It also found that the trial court had committed a legal error by entering judgment on the jury’s inconsistent responses to interrogatories as to Mr. Ferrell, in contravention of La.Code of Civ.Proc.Ann. art. 1813(E). The Supreme Court found that this legal error may have interdicted the fact-finding process and remanded the ease to this court for a de novo review to determine if Edward Ferrell was guilty of any negligence that was a legal or proximate cause of the accident and, if so, assign the proper percentage of fault to him. After doing so this court is to recalculate the *693 respective percentages of fault of Patrice Brown, the phantom driver, Officer Noble, and Mr. Paudice, and, if appropriate, calculate damages.
JsTHE TESTIMONY:
Patrice Brown testified that she was on her way from New Orleans to Slidell at approximately 6:30 p.m. on August 12, 1985, travelling east on Interstate 10 in the center lane of traffic, when her car began to drift to the left, and would not respond to her efforts to steer it back into the center lane. The car hit the concrete median on the left, did a 180 degree turn, and came to rest in the “safety lane” facing west. A portion of the car may have projected into the left lane of traffic, but she was certain that it came to rest close to the guardrail. She had had a similar experience some months before, and her car had only recently been repaired. She was very angry that it was damaged again. She got out of the car, and determined that the only damage was to the left front end. She believed that the car was driveable, but made no effort to move it.[3] She testified that the car directly behind her stopped immediately after her car came to rest. The man driving that car and a lady, who apparently stopped her car on the shoulder farther ahead, came to where Ms. Brown was. Approximately thirty seconds later a white car stopped behind the first car and a lady dressed in full police uniform got out. This police officer came to where Ms. Brown and the two other drivers were standing. Ms. Brown testified that the group talked for thirty to forty seconds when the police officer told her to run, grabbed her shirt and pulled her east on 1-10 until she heard several crashes.
Kimmie Cranford testified that traffic was moderate in terms of what he is used to at that time of day. He had just driven out of a thunderstorm into light rain, and was travel-ling at 50-55 miles per hour. The traffic around him was moving at 60-65 miles per hour. Near the crest of the Read Road overpass he saw |4Ms. Brown’s red Mazda begin to drift to the left. He was driving in the left lane, as was the Mazda when he first noticed it. The Mazda drifted into the area to the left of the lane where its left front bumper hit the guard rail concrete abutment, bounced off the guard rail, spun in a counterclockwise direction, and came to a stop facing oncoming traffic astride the dividing line between the left lane and the center lane, extending approximately three feet into the center lane, blocking both lanes of traffic. Mr. Cranford stopped his car in the left lane, approximately 150 feet behind the Mazda. He set his parking brake, turned on his emergency flashers, checked traffic behind him, got out of his car and ran to the Mazda to see if anyone was injured. He determined that the driver was alright. With the help of another motorist, he got Ms. Brown out of her car and onto the side of the road, away from the center lane of traffic. He then pushed her car from the center lane into the left lane. He was trying to talk to Ms. Brown when Reid Noble’s police ear pulled to a stop behind his car. Officer Noble turned on her emergency flashers, got out of her car, and approached Mr. Cranford, Ms. Brown and the other lady. She inquired what happened, and was given a brief explanation. She then used a hand-held radio to report the accident. Mr. Cranford estimated that he was on the scene about four to five minutes before the police officer arrived. He called Officer Noble’s attention to the danger of their position, and suggested that they get away from the cars. They began running away from his car, and had almost reached the Mazda when the police car was hit by Mr. Ferrell’s Toyota. Mr. Cranford did not see the impact, but he heard the crash and looked up to see his car sliding towards him. It stopped about twenty feet from where they were standing on a narrow strip between the left lane and the guardrail. The Toyota was hit by Mr. Paudiee’s red Cadillac, but Mr. Cranford did not see that collision freither. He ran toward the Cadillac, but when he determined that the driver appeared to be conscious he decided to stay by the Toyota because Mr. Ferrell’s condition seemed uncertain.
Reid Noble, an off-duty New Orleans police officer, testified that she had just gotten off duty when she saw a car stopped in the *694 left hand lane of 1-10 on the “upstroke” of the overpass over Read Boulevard. She came to a stop approximately fifteen feet behind this car, and discovered that there was a car in front of it facing the wrong way, against traffic, diagonally across the left hand lane. She put on her hazard lights, put her car in park, and walked forward to check on injuries. While doing so she called the dispatcher to advise that she was getting out on a possible wreck. She testified that she saw a gentleman and two ladies standing in the middle of the left lane of traffic; another lady was sitting on the guardrail. After determining that both Ms. Brown and Mr. Cranford’s ears were driveable and that no one was hurt,. she told everyone to get in their cars and move off. She was advising the dispatcher that she was moving the cars off the interstate, while walking back to her police car, when Mr. Fen-ell’s Toyota ran into the back of it and pushed it against Mr. Cranford’s car. Immediately after that Mr. Paudiee’s Cadillac ran into the back of Mr. Ferrell’s ear. Officer Noble alerted the dispatcher that there was an accident with injury and requested an emergency unit on a priority basis.
Officer Noble testified that she first saw Mr. Ferrell’s car when it was approximately twenty-five feet from her car. He appeared to be driving at the speed of the other traffic, which she estimated at 55 miles per hour or slower. She saw Mr. Ferrell look to the right immediately before the impact. She saw another car, driven by a woman travel-ling in front of Mr. Ferrell’s car almost hit the | ¡¡police car, move over two lanes of traffic, strike the guard rail on the right-hand side of the interstate and flee the scene. It was a matter of minutes between when Officer Noble stopped and she saw Mr. Ferrell’s ear.
Because of a head injury, Mr. Ferrell did not remember any details of the events immediately preceding the accident, the accident itself, or the first three or four days following the accident. The Emergency Room note indicates that he recalled sliding into another car, but he does not remember anything until he awoke in Intensive Care where relatives told him what had happened.
FAULT OF MR. FERRELL:
The jury found that Mr. Ferrell was at fault but that his fault did not cause the accident. We disagree. It had been raining before the accident so that the street was wet. It was overcast, but not yet dark. The hazard lights on Mr. Cranford’s and Officer Noble’s cars were on. The traffic was moderate to heavy, moving at approximately 50-65 miles per hour. Ms. Brown’s car was stopped facing oncoming traffic. Ms. Brown believed that her hazard lights were on. Mr. Cranford testified that the police car was stopped approximately 190 feet behind it, but Officer Noble estimated the distance at fifteen feet. Officer Noble testified that a car directly in front of Mr. Ferrell swerved suddenly to avoid hitting her police car, and that she saw him look to the right just before the collision. It did not appear to her that he applied his brakes, although she was not able to see his brake lights, and everything happened very quickly.
Mr. Ferrell had a duty to maintain a careful lookout. Chaisson v. J. Ray McDermott & Co., 324 So.2d 844 (La.App. 1st Cir.1975), writ denied, 328 So.2d 86 (La.1976). As the First Circuit noted in McIntyre v. Saunders, 554 So.2d 1371 (La.App. 1st Cir.1989), writ denied, 558 So.2d 583 (La.1990) there hare no hard and fast rules in deciding whether a motorist who strikes a stationary vehicle obstructing his lane should have observed the vehicle in time to avoid a collision. Rather, all of the facts and circumstances surrounding a particular case must be taken into consideration in making this decision. Id. at 1373. Factors to be considered include the locality of the accident, the lighting conditions, the respective positions of the vehicles, visibility and the presence and operation of lighting or warning equipment. Id.; Ramsey v. Langston, 140 So.2d 775 (La.App. 2d Cir.1962).
The evidence presented in this ease established that there were three stopped cars in the left-hand lane of traffic, and that the emergency flashers on two of these cars were lit. Traffic was moderately heavy. It was overcast, but visibility was good. It is quite possible that Mr. Ferrell’s attention *695 was focused on Ms. Brown’s Mazda, which was facing oncoming traffic and quite noticeable close to the crest of the overpass. Mr. Ferrell’s view may have been obstructed by the car directly in front of him so that he was not aware of the situation until that vehicle changed lanes. When he realized the situation, he may have looked to his right in order to determine if he safely could do the same. He did not have a great deal of time to react to the situation. However, it appears that he was following the car in front of him very closely. Taking all of these circumstances into consideration, we find that Mr. Ferrell was negligent and his negligence was a legal cause of the accidents.
RECALCULATION OF PERCENTAGES OF FAULT:
In accordance with our directive from the Supreme Court we have calculated the respective percentage of fault of the phantom vehicle, Ms. Brown, Officer Noble, Mr. Ferrell and Mr. Paudice. For the following reasons, we assign fifty 18percent fault to Ms. Brown, twenty-five percent fault to Mr. Ferrell, twenty-five percent fault to Mr. Paudice, no fault to the phantom driver, and no fault to Officer Noble.
We find that the phantom driver was not guilty of legal fault that was a proximate cause of this accident. The driver of this car was confronted with cars blocking her lane of traffic. She successfully took evasive action in response to this “sudden emergency” and avoided a collision. This driver did nothing to create the emergency situation with which she was confronted; she simply responded to it effectively. While Mr. Ferrell may have had a better opportunity to avoid the accident had this driver taken such action sooner, we can assign no legal fault to her. Marigny v. Allstate Ins. Co., 95-0952 (La.App. 4th Cir. 1/31/96), 667 So.2d 1229.
Mr. Paudice was in much the same situation as Mr. Ferrell. Like Mr. Ferrell he was following the car in front of him too closely. Consequently, he was unable to stop his car safely when Mr. Ferrell hit Officer Noble’s police ear. Although he may have had slightly more warning of the danger than did Mr. Ferrell, we assign twenty-five percent fault to him.
Officer Noble, who was off-duty, was travelling alone in a car owned by the New Orleans Police Department. This car was not equipped with special emergency fights, flares or other equipment that might have been used to alert traffic to a hazard. It had only the standard hazard fights with which all ears are equipped. Officer Noble engaged her hazard fights and stopped her car at a reasonable distance from Mr. Cranford’s car. She alerted her dispatcher, and moved toward the cars and people to determine the nature of the problem. Once she learned that no one was seriously injured and that the cars could all be moved | 9she notified her dispatcher that she would begin the process of clearing the cars from the highway. Mr. Ferrell’s car collided with her police car before this could be accomplished. Police records established that it was three minutes between the time she arrived on the scene and the time she called for an ambulance after the collision.
Officer Noble was in much the same position as Mr. Cranford,- whom the Supreme Court determined was not at fault. She stopped to render assistance in response to a situation that she had not created. She acted quickly and reasonably under the circumstances to remove the hazard, but was not able to do so before this accident occurred. We find that she,- like Mr. Cranford, was not at fault.
On the other hand, Patrice Brown was responsible for setting this entire chain of events in motion. The Supreme Court found that she had not carried her burden of exculpating “herself from negligence factually and legally causing the accidents because the objective facts contradict[ed] her story,” which the Court found to have been “internally inconsistent and implausible on its face.” Ferrell at p. 6, 650 So.2d at 747. The Court found that she had failed in her duty to maintain control of her vehicle even in rainy weather and had also violated her duty to take all precautions possible to warn other motorists of the hazard she had created. In addition, Ms. Brown did nothing to correct the situation once her car came to rest facing *696 oncoming traffic. Even accepting her testimony that her car came to a stop on the shoulder against the guardrail, she acknowledged that it protruded into the left-hand lane of traffic three feet.[4] It was established that herjjpcar was five feet seven inches wide, and that the shoulder was six feet three inches wide. There was nothing to prevent her pulling her car completely onto the shoulder. Had she done so Mr. Cranford would not have felt the need to protect her by placing his car, which was more visible, in the left lane of traffic. While it is understandable that she would have been shaken up, she was not seriously hurt nor was her car severely damaged. In fact, her testimony and that of Mr. Cranford establish that her primary emotion was anger at having her car damaged so soon after it was repaired following a prior accident. We, therefore, assign fifty percent fault to her in causing this accident.
DAMAGES:
Mr. Ferrell hit the steering wheel and windshield of his car. He lost consciousness for an undetermined period of time. Dr. Gary F. Gray saw him in the hospital emergency room, and admitted him to the hospital. He had multiple abrasions of the ribs and multiple lacerations, including a laceration of the left knee. He was found to have blunt chest trauma with rib fractures and cardiac contusion, fracture of the spinous process at C-7, blunt abdominal trauma, traumatic subdural hematoma and cerebral edema. Due to his closed head injury he was seen by Dr. Bert Bratton, a neurosurgeon, and Dr. Thomas A. Krefft, a neurologist. Both of these physicians recommended conservative treatment and observation. He was hospitalized from August 12 through August 19, 1985. During this hospitalization he had two generalized tonoclonic seizures. Dr. Krefft, who testified at trial by deposition, described a tonoclonic seizure as a serious occurrence involving stiffness, followed by jerking of the extremities and loss of consciousness. He diagnosed Mr. Ferrell as having a seizure disorder secondary Into the traumatic subdural hematoma and the cerebral edema. He was given dilantin, an anti-convulsant medication, for approximately three weeks.
Dr. Krefft treated Mr. Ferrell from August 13,1985, through June 1,1987. He saw him again on May 19,1989. He referred Mr. Ferrell to Sheldon Herring, Ph.D., for a neu-ropsychological evaluation two years after the accident. Dr. Herring noted that Mr. Ferrell presented with complaints of recurrent headache, impaired daily memory, difficulties with concentration, obsessive thoughts over financial concerns, and decreased libido. Mr. Ferrell described his complaints as having worsened over the several months prior to the evaluation, and reported a decline in his overall work performance due to difficulties concentrating and in relating to his co-employees. He also admitted to recurrent depressive mood. Dr. Herring’s testing indicated that Mr. Ferrell was open and forthright in his responses to all questions and attempted to present himself in an honest manner. The testing disclosed adequate performance in several areas, but identified evidence of mild impairment in reasoning skills, particularly in the ability to adapt to changing demands. Dr. Herring also found weakness in verbal list learning ability and some right-sided motor deficits. Dr. Herring found that the profile obtained by the testing demonstrated measurable sequelae to Mr. Ferrell’s original injury. The deficits identified correlated with dysfunction of the left anterior cerebral hemisphere of the brain. Despite identifying several areas of weakness, Dr. Herring found that Mr. Ferrell’s overall profile was not consistent with some of his complaints, particularly the complaints of very poor concentration and memory abilities. He felt that these difficulties were indirect effects of his emotional status. He also found that Mr. Ferrell’s difficulties with par- *697 tieular areas of reasoning may have been contributing to his poor job performance and [increasing his frustration level with a subsequent decline in functional memory and concentration skills. Dr. Herring noted that this was a fairly common finding following traumatic brain injury.
Dr. Krefft testified that Mr. Ferrell’s post-traumatic syndrome is permanent. He felt that Mr. Ferrell had reached maximum recovery from the head injury, he sustained in the auto accident by the time of Dr. Herring’s testing. Dr. Krefft felt that the cognitive function and behavior problems noted by Dr. Herring were not going to improve.
Mr. Ferrell was treated by Dr. James R. Gosey, Jr. from September 9, 1985, through November 17, 1989, for the injury to his left knee. On May 1, 1986, approximately nine months after the accident, Dr. Gosey performed an arthroscopy of the left knee to investigate complaints of pain and popping in this knee despite physical therapy rehabilitation. This procedure, which was performed under a general anesthetic, disclosed a defect of the medical femoral condyle. Scar tissue was removed from this area to free it. Dr. Gosey confirmed a healed defect in the medial femoral condyle. There was also excessive scar tissue and synovium on the anterior portion of the lateral compartment, which was removed. The patella had a “good sized” defect in its mid-portion with some deep cracking. There was also significant chondromalacia, which required debridement. Examination of the excised cartilage fragments and synovial tissue disclosed mild chronic inflammation. The prognosis following the surgery was fair. Dr. Gosey was certain that he had eliminated some popping, but opined that Mr. Ferrell had some significant long-term chondromalacia that might present additional problems in the future.
li3Mr. Ferrell, who was 48 years old at the time of the accident, testified that he had no independent memory of the accident nor any memory of his first days in the hospital. He convalesced at home for approximately six weeks and then returned to his job as security manager for Maison Blanche. Mr. Ferrell’s employer paid him for the time he missed from work as a result of the initial injury and following the knee surgery in 1986. He lost his job with Maison Blanche when it was bought by another company, and he had not found new employment as of the time of trial, despite having sent out numerous applications around the country. Mr. Ferrell did not claim lost income.
Mr. Ferrell testified that he felt that his ability to function in his job was impaired after the accident. He described problems controlling his temper and dealing with the people he supervised and memory problems. He described the exercises he performed in order to improve his memory. He testified that he had significant problems with his knee, but that this had improved following the surgery done by Dr. Gosey. He felt that he was able to keep his knee in good shape by exercising regularly.
Reva Ferrell testified that her family’s home life had changed a great deal since her husband’s accident. Mr. Ferrell became more irritable with both her and their daughter. This situation had improved some because she made an effort to understand the problem and avoid irritating her husband and because he worked very hard at controlling his irritability. She testified that her intimate relationship with her husband also had suffered following the accident.
Based on all of the above we find that an award of $475,000 in general damages is fair and adequate compensation to Mr. Ferrell for the injuries he sustained in this accident. The total cost of Mr. Ferrell’s medical treatment was li4$14,098.06, and he is entitled to recover that amount in special damages. We find that $25,000 is fair and adequate compensation for Mrs. Ferrell for her loss of consortium as a result of the injuries to her husband.
FIREMAN’S FUND’S INTEREST LIABILITY:
Revised Statute § 13:4203 requires all liability insurers to pay interest on their policy limits from date of judicial demand, but it does not prohibit an insurer from limiting its interest obligation on excess judgments. Martin v. Champion Ins. Co., 95-0030, pp. 5-6 (La. 6/30/95), 656 So.2d 991, *698 995. Each policy’s supplemental payment provision must be analyzed to decide an insurer’s interest liability in a particular case. Id. at p. 8, 656 So.2d at 996.
The Fireman’s Fund policy at issue here provides for supplementary payments as follows:
In addition to our limit of liability, we will pay on behalf of a covered person:
[[Image here]]
3. Interest accruing after a judgment is entered in any suit we defend. Our duty to pay interest ends when we offer to pay that part of the judgment which does not exceed our limit of liability for this coverage.
Fireman’s Fund contends that, as explained in Doty v. Cent. Mut. Ins. Co., 186 So.2d 328, 336 (La.App. 3d Cir.), writ denied, 249 La. 486, 187 So.2d 451 (La.1966), such provisions are intended to protect the insured from the accrual of post-judgment interest when the insurer unilaterally decides to appeal. Since its insured, Patrice Brown, was not made a defendant by the plaintiffs and judgment cannot be rendered against her, Fireman’s Fund argues that the supplemental payment provision does not apply. The insurer therefore asserts it is liable only for interest from date of judicial demand on the remaining $7,500 due under its coverage limits.
| isWe must reject Fireman’s Fund’s interpretation. Under the Direct Action statute, enacted for the benefit of injured tort victims, the insurer stands in the shoes of its insured. La.Rev.Stat.Ann. § 22:655; Vowell v. Mfrs. Casualty Ins. Co., 229 La. 798, 811, 86 So.2d 909, 914 (1956). If an insurer’s interest liability were to depend on whether the insured had been made a party to the suit, the purpose of the Direct Action statute would be defeated. Therefore, Fireman’s Fund’s liability for interest in this case is determined based upon the language of the supplemental payments provision in the policy, without regard to Patrice Brown’s status in the suit.
The plaintiffs assert that the policy language used here has not yet been interpreted in this Circuit, but should be found ambiguous and thus interpreted against the insurer, as was done in McLemore v. Fox, 565 So.2d 1031 (La.App. 3d Cir.), writs denied, 569 So.2d 966, 968 (La.1990). They therefore argue that interest should be assessed on the entire judgment, without'regard to the policy limits, from judicial demand until paid.
The policy at issue in McLemore, 565 So.2d at 1036-37, provided that:
Allstate will pay ... all interest on any judgment entered in such suit until Allstate has paid, tendered or deposited in court that part of the judgment which does not exceed the limit of Allstate’s liability thereon. Interest will be paid only on damages which do not exceed Allstate’s limits of liability ...
The Third Circuit found that in order to give meaning to both sentences of this endorsement, the limitation on the insurer’s interest liability would only apply if a tender had been made. Since Allstate had not made any such offer, it was held liable for interest on the entire judgment from date of judicial demand.
Unlike the policy language at issue in McLemore, the relevant clause in the Fireman’s Fund policy at issue in this case is not ambiguous. Fireman’s Fund has 116agreed to pay, in addition to its limits of liability, “[¡Interest accruing after a judgment is entered in any suit we defend.” We agree with the First Circuit that the insurer intended by this language to provide supplementary protection to its insureds for interest accruing after entry of judgment. See Malbrough v. Wallace, 594 So.2d 428, 438 (La.App. 1st Cir.1991), writ denied, 596 So.2d 196 (La.1992); Nicholes v. St. Helena Parish Police Jury, 604 So.2d 1023, 1028-29 (La.App. 1st Cir.), writ denied, 605 So.2d 1378 (La.1992). We find no ambiguity in this provision, and agree with the First Circuit in its interpretation. Accordingly, we find that Fireman’s Fund is liable for legal interest on its policy limits from judicial demand until paid, plus legal interest on any additional judgment based upon Patrice Brown’s legal fault from the date of judgment until payment is made.
*699 COSTS:
The trial court cast Antoine Paudice and the Ferrells for all costs because their claims were dismissed. The issue of costs was not raised in the original appeal to this court. Mr. and Mrs. Ferrell now ask that Fireman’s Fund be cast for $17,960.80 in trial and appeal costs and expert fees. Additionally, the Ferrells claim that this award should include interest from the date of judicial demand.
Fireman’s Fund disputes the amount of costs being claimed and contends that the amount of costs and fees to be assessed must be determined by the trial court based upon supporting or controverting evidence. Fireman’s Fund urges this court to remand the case for a rule to tax costs pursuant to Article 1920 of the Code of Civil Procedure and Revised Statute 13:3666.
Under Articles 1920 and 2164 of the Code of Civil Procedure, both the trial and appellate courts are vested with the discretion to render judgment for costs. Bourque v. Koury, 95-286 (La.App. 3d Cir. 11/2/95), 664 So.2d 553; Scamardo v. Dunaway, 94-545 (La.App. 5th Cir. 2/15/95), 650 So.2d 417. The Ferrell’s successful writ application to the Supreme Court has resulted in an award in their favor. Therefore, we find that costs are to be taxed against Fireman’s Fund. Having made this determination, however, the applicable statutes require that the amount of taxable costs be determined by contradictory hearing in the trial court. La. Code Civ.Proc.Ann.1920; La.Rev.Stat.Ann. § 13:3666 B(2); see also Perez v. State Dept. of Transp. & Dev., 578 So.2d 1199, 1208 (La.App. 4th Cir.), writ denied, 581 So.2d 706 (La.1991). Although the Ferrells’ filing fees are readily determinable from the Clerk of Court statements attached to their brief, Fireman’s Fund correctly asserts that such attachments are not record evidence in this case. White v. W. Carroll Hosp., Inc., 613 So.2d 150, 154 (La.1992); Martin v. Martin, 95-0466, p. 5 (La.App. 4th Cir. 10/26/95), 663 So.2d 519, 522, writ denied, 95-2806 (La. 1/29/96), 666 So.2d 682.
Article 1921 of the Code of Civil Procedure provides that “[t]he court shall award interest in the judgment as prayed for or as provided by law.” In Cajun Elec. Power Co-op. v. Owens-Corning Fiberglass Corp., 616 So.2d 645, 647 (La.1993), it was held that until a judgment for costs was rendered under Article 1920 of the Code of Civil Procedure, “no sum is due to either party upon which to award interest,” and therefore interest would accrue only from the date of the judgment, not from the date of demand. Although the only costs at issue in Cajun Electric were expert witness fees, the Supreme Court’s rationale applies equally to filing fees and other litigation expenses included within a judgment casting a party with an opponent’s costs. Accordingly, no interest is due on any award for costs until the trial court, on remand for a rule to tax costs, renders judgment.
liaFor the reasons assigned, Patrice Brown is assessed with fifty percent fault in causing the accidents. Edward Ferrell is assessed with twenty-five percent fault, and Antoine Paudice is assessed with twenty-five percent fault. Edward Ferrell’s damages are $489,-098.06; Reva Spiegal Ferrell's damages are $25,000. Fireman’s Fund is to pay legal interest on the remaining amount of its policy limits from the date of judicial demand, and on the amount in excess of its policy limits from June 2, 1992, the date judgment was rendered by the trial court. This matter is remanded to the trial court in order to determine the amount of taxable costs, and to enter judgment in accordance with this opinion.
Fireman’s Fund’s Motion for Rendition of Judgment is denied as moot.
MOTION DENIED; JUDGMENT REVERSED AND RENDERED; MATTER REMANDED.

. There is a factual inaccuracy in the original opinion of this court and in the opinion of the Supreme Court in that both state that Mrs. Ferrell weis a passenger in her husband's car at the time of the accident. This inaccuracy was corrected by the original panel of this Court on reheEiring. See Ferrell v. Fireman's Fund Ins. Co., 92-2116 (La.App. 4th Cir. 2/25/94), 635 So.2d 1152 at 1157, aff'd in part, rev'd in part, 94-1252 (La. 2/20/95), 650 So.2d 742.

. Ms. Brown's testimony conflicted with Mr. Cranford's testimony in this regard.

. Ms. Brown's car eventually was removed from the scene by a tow truck.

. Ms. Brown's testimony is at odds with the testimony of Officer Noble and Mr. Cranford, who both placed the Mazda in the left-hand lane of traffic, close to the line between the left and center lanes at the time of the collision between Mr. Ferrell's car and the police car. Mr. Cran-ford testified that the Mazda was “straddling” the line between the left and center lanes when he first approached it. He then pushed it into the left-hand lane in order to allow traffic to use the center lane.