PER CURIAM.[1]
hThe Louisiana Constitution of 1974 directs that “[t]he judge oldest in point of service on the supreme court shall be chief justice.” La. Const, art. V, § 6. With only some two months of service separat *10 ing Justice Johnson and Justice Victory, the issue can be stated simply: does time spent appointed to this court count toward seniority in determining which justice is “oldest in point of service” as called for in the constitution, Article V, § 6? For the reasons that follow, we find that appointed service does count towards seniority.
The issue currently before the court poses a discrete and unprecedented matter which, although arising in this matter, could also potentially arise in other contexts.[2]
This court is constitutionally tasked with resolving legal matters. This issue represents one more matter to be resolved.
Among the foundations of our system of justice is due process, which embodies fundamental fairness and at its essence requires notice and an opportunity to be heard before a decision is made. When two justices made competing claims, which they |2could not resolve between themselves, guiding judicial principles of justice, fairness, and due process obligated this court to establish an impartial procedure to resolve those claims. To that end, no one was deprived of anything. To the contrary, months before an actual vacancy in the office of chief justice, this court afforded each claimant precisely what due process requires: the right to be heard before a decision is made.[3]
This court, like any other in the American justice system, is entrusted with the obligation to provide a fair, just, and impartial process for the resolution of disputes. Courts are obligated to zealously safeguard the process itself for resolving disputes by ensuring that each side is heard before a decision is made. Any effort to deprive one side or the other of the opportunity to be heard before a matter is decided is antithetical to any notion of fundamental fairness embodied in the state and federal constitutions.[4] Our system of justice dictates — and due process demands — that when competing claims are made, both sides must be heard so fundamental fairness and impartiality are ensured.
The Code of Judicial Conduct, Canon 3(A)(1) provides, in part, that “[a] judge shall be unswayed by partisan interests, public clamor or fear of criticism.”
Routinely, in matters before this court, each side is convinced of the righteousness of his or her cause. While commentators and others are free to pontificate and opine on how they believe a matter should be resolved, often without hearing from both sides, a court must answer legal questions rationally, ^dispassionately, and *11 based on the law and facts immediately before the court. This matter involves a Louisiana constitutional law issue which, in our system of justice, this court and no other is qualified to answer. Although commentators have loudly emphasized them, factors which we do not ascribe any importance to in answering the constitutional question before us include issues of gender, geography, personality, philosophy, political affiliation, and race — all of which have the potential to inflame passion; however, not one of these factors provides so much as a feather’s weight on the scales of justice.
We resolve this matter, as the constitution requires, without passion or prejudice, but rather, based on the law applied impartially to the facts. Justitia, the universally recognized symbol of justice, is blindfolded to prevent consideration of irrelevant factors and ensure objectivity and impartiality. Similarly, the constitution is color-blind, written in black letters on white paper, which occasionally produces grey areas. It is the role of the judiciary to resolve competing claims by interpreting that most fundamental legal document, which emanates from the citizens of Louisiana.
FACTUAL AND JURISDICTIONAL BACKGROUND
At issue are the claims of two sitting justices on this court to become chief justice upon the retirement of Chief Justice Catherine D. “Kitty” Kimball on January 31, 2013.
Justice Bernette Joshua Johnson and Justice Jeffrey P. Victory, shortly after each was seated on this court, claimed to have seniority for two purposes: 1) the perquisites of office and 2) eventual succession to the position of chief justice. Justice Johnson had been elected to a seat on the Court of Appeal, Fourth Circuit and assigned to sit on this court pursuant to an order signed by then Chief Justice Pascal |4F. Calogero following a consent decree in a federal Voting Rights Act case; she took office on October 31,1994. Justice Victory took office some two months later, on January 1,1995, after being directly elected to fill a vacancy on this court.
The claims of Justices Johnson and Victory were previously aired as an administrative matter and considered in an administrative conference on January 19, 1995. This court administratively determined that Justice Johnson would be accorded perquisites of office in preference to Justice Victory, under a new policy that recognized “continuous service” on this court.[5] This court also administratively determined that “it is not presently confronted ... and may never be so confronted” with the question of succession to chief justice as between Justices Johnson and Victory.[6] This court made no binding determination as to whether Justice Johnson or Justice Victory had a superior position of seniority for purposes of eventually succeeding to the office of chief justice.[7] Instead, the *12 members of this court at the Rtime reserved their administrative judgment “in the event of a future controversy between Justice Johnson and any elected justice whose initial term of office on the Court commences after October 31,1994.”[8]
Article V, § 6 of the Louisiana Constitution empowers the chief justice to serve as “chief administrative officer of the judicial system of the state.” This power is limited by being “subject to rules adopted by the [supreme] court.” Id. Chief Justice Kimball announced her retirement and, being aware of the past claims by Justices Johnson and Victory regarding seniority and the order of succession, Chief Justice Kimball scheduled for discussion the goals of achieving an orderly succession and ascertaining whether any dispute presently existed.[9] As before, Justices Johnson and Victory reiterated their longstanding views that each had seniority superior to the other.[10]
This court sought to establish a fair, just, and impartial method of resolving the legal issue presented. Having made claims disputing the order of succession and due to their interests in the outcome, Justices Johnson and Victory were recused from further participation in this matter.[11] Then, acting within their constitutional authority | fito adopt administrative rules under Article V, §§ 5 and 6,[12] the remaining four justices not recused (constituting a quorum under Article V, § 3)[13] established rules and procedures for resolving this matter. This procedure is not unprecedented as this issue was previously ad *13 dressed administratively, as indicated, in January 1995. Believing that good order and the administration of justice would be best served by publicly reporting on the succession to chief justice, the quorum determined that a written opinion was appropriate. This court is emphatically and singularly the ultimate authority on issues related to the Louisiana Constitution, particularly on an issue related to the administration and composition of this court.[14] Consideration of this matter by a district court in the absence of a factual dispute would be an inappropriate waste of time and judicial resources when this unique and unprecedented matter solely calls for a determination related to the constitutionally-described succession to the office of chief justice on this court. In an effort to provide a neutral methodology of adding three appellate court judges to serve ad hoc, the three chief judges with the longest tenure were appointed. Accordingly, just as in other matters meriting an opinion, a briefing schedule was set. To account for 17briefing and an eventual written opinion, the matter was assigned a docket number and caption. These and other administrative and procedural rules were detailed in an order dated June 13, 2012, unanimously adopted and signed by Chief Justice Kim-ball for the court.[15]
The origins of this matter have already been publicly reported by this court in Perschall v. State, 96-9322 (La.7/1/97), 697 So.2d 240. The Perschall opinion describes federal voting rights litigation “alleging the method of electing justices from [plaintiffs’] district — the first supreme court district, composed of Orleans, Jefferson, St. Bernard, and Plaquemines Parishes—impermissibly diluted minority voting strength.” Id., 96-0322 at 3, 697 So.2d at 244. As part of a settlement of this litigation (often referred to by the name of one of the plaintiffs as the “Chisom case”), a consent judgment was rendered by the federal court where the litigation was pending, calling for redistricting of the first supreme court district.[16]
In fact, “while the [Louisiana] legislature was in session, all parties involved in Chisom were attempting to settle the lengthy Chisom, litigation.” Id., 96-0322 at 6, 697 So.2d at 246. “[T]he parties sought concurrent enactments to effectuate the case’s settlement: (1) a legislative act, and (2) a federal consent judgment memorializing such act.” Id.
*14 Legislation was proposed to achieve the following:
First, the bill would enact La. R.S. 13:101.1, relative to reapportionment of supreme court districts. Section 101.1 created a supreme court district comprised of Orleans Parish for the purpose of electing a justice, which justice would take office in the newly created district on January |sl, 2000, or earlier if a vacancy occurred in the first supreme court district before January 2000. The section also instructed the legislature to reapportion the supreme court into seven districts in the 1998 Regular Session based on the most current census data. (FN7) These new districts would become effective on January 1, 2000 for elections occurring on or after January 1, 2000. Lastly, section 101.1 provided that the justices holding office on the effective date of the Act, June 22,1992, would not be affected by section 101.1. In addition, retirement benefits provided by La. R.S. ll:558(A)(5)(a)(ii) were extended to each justice holding office as of June 22, 1992. (FN8)
The second substantive amendment to SB 1255 proposed in committee was the enactment of La. R.S. 13:312.4. In short, section 312.4 created the “Chisom seat.” (FN9) Section 312.4 would create an additional judgeship for the Court of Appeal, Fourth Circuit. The section provided that an election to this seat would take place in the 1992 congressional primary election, with the term of office commencing January 1, 1993. The section provided that pursuant to the power vested in the supreme court by LA. CONST, art. V, § 5(A), the judge elected to the fourth circuit seat would immediately be assigned by the supreme court to sit on the supreme court. While assigned, the section instructed that the judge would “participate and share equally in the cases and duties of the justices of the supreme court during the period of assignment. Further, the judge shall receive the same compensation, benefits, expenses, and emoluments of office as are now or as may hereafter be provided by law for justices of the Louisiana Supreme Court.” Section 312.4 contained an expiration provision that would dissolve the “Chisom seat” on the first of two occurrences: (1) once a justice takes office in the new Orleans Parish district before January 2000 upon a vacancy in the first district, or (2) once a justice takes office in the new Orleans Parish district after being elected in the regular supreme court election held in the year 2000.
Finally, the amendments to SB 1255 provided that the legislation would be voided and of no effect if a consent decree in the Chisom case was not entered into in federal court. The Act would become effective on the governor’s signature.
(FN7.) With regard to the new Orleans Parish district, section 101.1 specifically provided that if a first district vacancy occurred after the 1998 reapportionment but before January 1, 2000, the special election to fill the vacancy would occur in the Orleans district.
[[Image here]]
(FN9.) The judge first elected to fill the seat authorized by section 312.4 was the Honorable Revius O. Ortique, Jr, and its current occupant is the Honorable Ber-nette Joshua Johnson.
Id., 96-0322 at 6-7, 697 So.2d at 246.
| sUltimately, “[t]he bill was signed into law on June 22, 1992 by Governor Edwin W. Edwards and became Act 512.” Id., 96-0322 at 8, 697 So.2d at 247. Then:
On August 21, 1992, all parties involved in the Chisom case, as well as the federal district judge, signed a Consent *15 Judgment in the United States District Court for the Eastern District of Louisiana. The district court’s order stated that the Consent Judgment “memorializes” La. Acts 1992, No. 512 and effectively closed the Chisom case....

Id.

As noted above, “The judge first elected to fill the seat authorized by section 312.4 [the Chisom seat] was the Honorable Revi-us 0. Ortique, Jr, and its current occupant is the Honorable Bernette Joshua Johnson.” Id., 96-0322 at 7 n. 9, 697 So.2d at 246 n. 9. Under this arrangement, Justice Johnson was elected to a seat on the Court of Appeal, Fourth Circuit and by order dated October 28, 1994, she was appointed by this court to serve on this court, effective October 31, 1994. Justice Johnson has served on this court continuously since that time. In the year 2000, after a new supreme court district was drawn, Justice Johnson was elected to a seat on this court and she was later re-elected. Justice Victory took office some two months after Justice Johnson’s appointed service began, as Justice Victory’s service commenced on January 1, 1995. Justice Victory has served on this court continuously since that time, as he was later re-elected.
LAW and ANALYSIS
The standards for interpreting the constitution have been summarized as follows:
The starting point in the interpretation of constitutional provisions is the language of the constitution itself. Louisiana Mun. Ass’n v. State, 00-0374, p. 5 (La.10/6/00), 773 So.2d 663, 667. When a constitutional provision is plain and unambiguous, and its application does not lead to absurd consequences, its language must be given effect. Id. at pp. 5-6, 773 So.2d at 667; State ex rel. Guste v. Board of Com’rs. of Orleans Levee Dist., 456 So.2d 605, 609 (La.1984); Bank of New Orleans & Trust Co. v. Seavey, 383 So.2d 354, 356 (La.1980).
When the constitutional language is subject to more than one reasonable interpretation, however, the determination of the intent of the provision becomes necessary. Louisiana Mun. Ass’n., 00-0374 at p. 6, 773 So.2d at 667. In seeking to ascertain constitutional intent, the same general rules used in interpreting laws and written instruments are followed. Caddo-Shreveport Sales & Use Tax Comm’n. v. Office of Motor Vehicles, 97-2233, p. 6 (La.4/14/98), 710 So.2d 776, 780; Radiofone, Inc. v. City of New Orleans, 93-0962, p. 6 (La.1/14/94), 630 So.2d 694, 698. This court has stated that the function of a court in construing constitutional provisions is to ascertain and give effect to the intent of the people who adopted it. Caddo-Shreveport, 97-2233 at p. 7, 710 So.2d at 780; Radiofone, 93-0962 at p. 6, 630 So.2d at 698. Additionally, we have determined that the understanding that can reasonably be ascribed to the voting population as a whole controls the interpretation. Id. In other cases, however, this court has stated that in construing constitutional provisions, a court should ascertain and give effect to the intent of both the framers of the amendment and of the people who adopted it. See Board of Com’rs. of Orleans Levee Dist. v. Department of Natural Resources, 496 So.2d 281, 298 (La.1986) (on rehearing). All of these principles are correct statements of law. Nevertheless, to harmonize them, we will add that in construing an ambiguous constitutional provision, a court should ascertain and give effect to the intent of both the framers of the provision and of the people who adopted it; however, in the case of an apparent conflict, it is the intent of the voting population that controls. See Arata v. *16 Louisiana Stadium & Exposition Dist., 254 La. 579, 225 So.2d 362, 372 (1969).
East Baton Rouge Parish School Bd. v. Foster, 02-2799, pp. 16-17 (La.6/6/03), 851 So.2d 985, 996.
Applying these principles, we first note that Article V, § 6 does not, on its face, distinguish between elected service and appointed service. According to the plain wording of this very brief provision (which does not expressly define “service”), it is reasonable to interpret Article V, § 6 to either be restricted to elected service or to not be so restricted. Finding Article V, § 6 susceptible to more than one reasonable meaning, we continue to apply the principles described in Foster. We are called on, therefore, to determine the intent of Article V, § 6.
| nIf the constitution’s framers and the electorate had desired to distinguish between elected and appointed service, then it would have been a straightforward matter to do so. The word “elected” could have easily been added before the word “service.” However, because the word “elected” or an equivalent expression was not added in Article V, § 6, this court would trample upon the will of both the framers of the constitution and the electorate if it were to supply the word “elected,” given that the criteria for becoming chief justice are enshrined in our constitution and, therefore, those criteria have essentially been enacted by both the framers and the electorate. See Carter v. Duhe, 05-0390, p. 10 (La.1/19/06), 921 So.2d 963, 970 (“[I]t is not the function of the judicial branch in a civilian legal system to legislate by inserting ... provisions into statutes where the legislature has chosen not to do so.”); Tullier v. Tullier, 464 So.2d 278, 282 (La.1985) (“The judicial branch of government merely interprets ... expressions of legislative will. The decisions of our state courts do not create or eliminate substantive rights as this is the proper function of the legislature.”); cf. Foster, 02-2799 at 16, 851 So.2d at 996 (“In seeking to ascertain constitutional intent, the same general rules used in interpreting laws and written instruments are followed.”).
Given that the power to appoint a judge to sit as a justice on this court is provided to this court elsewhere by the constitution (see La. Const, art. V, § 5(A)),[17] we are also called to interpret both provisions (Article V, § 6 and Article V, § 5(A)) in a manner that gives effect to each without conflict. Because Article V, § 6 contains | |2no exclusion or limitation of the power given by Article V, § 5(A) to appoint a judge to this court, we would cast into conflict our appointment power with the seniority provision of Article V, § 6 if we were to limit seniority to only elected service. See City of New Orleans v. Louisiana Assessors’ Retirement and Relief Fund, 05-2548 (La.10/1/07), 986 So.2d 1, 15 (“Under our wellsettled rules of statutory construction, where it is possible, courts have a duty in the interpretation of a statute (or by analogy, constitutional provision) to adopt a construction which harmonizes and reconciles it with other provisions dealing with the same subject matter.”). The conflict lies in the fact that our appointment of a judge to this court would be something less than a true appointment if the judge’s service — without *17 an express limitation in the constitution— somehow did not fully count in calculating service. The rules of constitutional interpretation require us to harmonize provisions when possible, while avoiding such absurd results. See Foster, 02-2799 at 16-17, 851 So.2d at 996.
*16 The supreme court has general supervisory jurisdiction over all other courts. It may establish procedural and administrative rules not in conflict with law and may assign a sitting or retired judge to any court. The supreme court shall have sole authority to provide by rule for appointments of attorneys as temporary or ad hoc judges of city, municipal, traffic, parish, juvenile, or family courts.
*17 When reviewing the history of this court’s appointment power and the structure of this court, we find further support for counting appointed service for purposes of becoming chief justice. As background, La. Const, art. V, § 3 indicates that the court is composed as follows: “The supreme court shall be composed of a chief justice and six associate justices, four of whom must concur to render judgment.” [18] During the Constitutional Convention of 1973, after this provision was introduced from the Judiciary Committee to the general delegation, the following question was posed: “[I]n the present [1921] constitution in dealing with the composition of the Supreme Court, it provides that except when judges of other courts are called in this is the composition of the Supreme Court, is that taken care of in other provisions?” State |]Sof Louisiana Constitutional Convention of 1973 Verbatim Transcripts, Aug. 15, 1973, p. 708 (hereinafter the “Verbatim Transcripts”). The Chairman of the Judiciary Committee, Judge [later Justice] Dennis replied: “We have provided in Section 5A that the Supreme Court may assign a sitting or retired judge to any court. Since it has this broad power we felt it unnecessary to state here that district judges could be called in” Id.
Therefore, the intent of the Judiciary Committee as expressed by its chair, was that the composition of this court included the judges who were appointed to this court. There was no intent to deviate from the prior constitution’s recognition that this court includes the judges who were appointed to this court. Indeed, the Constitution of 1921, art. VII, § 4 provided, in pertinent part: “Except when judges of other courts are called in, as elsewhere provided in this Constitution, the Supreme Court shall be composed of a Chief Justice and six Associate Justices.” During the Constitutional Convention of 1973, it was simply viewed as redundant to say that this court comprised both elected and appointed judges, because the proposed constitution included a provision for appointing judges to all courts, including this court. Therefore, for purposes of seniority, the phrase “[t]he judge oldest in point of service on the supreme court” in current Article V, § 6 should be read against a constitutional background that recognized court service both by election and by appointment. See Fruge v. Board of Trustees of Louisiana State Employees’ Retirement System, 08-1270, p. 17 (La.12/2/08), 6 So.3d 124, 135 (explaining that when “the redactors intended no change in the constitution from prior law,” as evidenced by comparing the wording of the current constitution to the 1921 constitution, and considering also the statements of a constitutional convention delegate, this court would continue to apply previously recognized legal principles).
|uThis constitutional background of being appointed, or of being “called in” to serve on the supreme court (as referred to in the exchange quoted earlier between a delegate and committee chair), placed the appointed judges on equal footing as the elected judges because both elected and appointed judges “composed” this court. See La. Const, art. VII, § 4 (1921). Of further import, under the 1921 Constitution-just as now — the chief justice was to *18 be the “oldest in point of service.” La. Const, art. VII, § 7 (1921).
Once it is recognized that the supreme court is composed not only of elected, but also of appointed justices, the case for counting the service during appointment for purposes of seniority becomes even more compelling — especially given the fact that the wording of the present seniority provision does not refer to a “justice,” but to a “judge.” Compare La. Const, art. V, § 6 (1974) (“The judge oldest in point of service on the supreme court shall be chief justice”) and La. Const, art. VII, § 7 (1921) (“Whenever a vacancy shall occur in the office of Chief Justice, the justice oldest in point of service shall succeed thereto.”). Cf. Lee Hargrave, The Judiciary Article of the Louisiana Constitution of 1974, 37 La.L.Rev. 765, 768 n. 7 (1977) (“The constitution makes no technical distinction between the terms ‘justice’ and ‘judge.’”), cited with approval in Perschall, 96-0322 at 20 n. 25, 697 So.2d at 254 n. 25.
Accepting this proposition as true — that there is no distinction meant in the present constitution between the terms “justice” and “judge” — the present constitution, thus, embraces with the broadest terminology those who sit on the court and, hence, embraces the possibility that seniority accrues whether sitting is the result of election alone or election plus appointment. See Ocean Energy, Inc. v. Plaquemines Parish Government, 04-0066, p. 14 (La.7/6/04), 880 So.2d 1, 11 (finding that the state’s | ^electorate likely understands the terminology of proposed constitutional provisions according to the ordinary meaning of the words used, rather than as more narrowly defined terms of art). In other words, because the constitution emanates from the people adopting it, there seems to be little likelihood that the people intended that filling a vacancy in the chief justice position should hinge upon multifaceted legal arguments regarding which periods of service on this court actually count. Our further review of the enactment history of Article V, § 6 shows that what was intended was a simple and straightforward process of crediting service on this court, no matter how the service was earned.
The seniority criterion, as noted earlier, is present in both the current Constitution of 1974 and in the immediately preceding Constitution of 1921. It was not without careful consideration, however, that seniority was kept as the sole criterion. Professor Hargrave, the co-ordinator of legal research for the Constitutional Convention of 1973, summarized a journey of many months of deliberations and debate during the Convention thus:
The committee struggled with the method of selecting the chief justice. The fact that the seniority system had recently resulted in three chief justices in a ten month period, and the fear of the destabilizing effect such turnover could have on judicial administration concerned many members. An Institute of Judicial Administration study questioned selection by seniority and had suggested election by the justices as an alternative. Early in its deliberations, the committee did opt for election of the chief justice by the members of the supreme court, but soon after, Justice Frank W. Summers appeared before the committee and strongly urged retention of the seniority system to avoid possible infighting on the court and to minimize political influences possibly affecting selection of a chief justice. The committee then reversed its position and adopted a modified seniority system under which the judge senior in service would become chief justice if he was below the age of 65 at the time a vacancy was to be filled. Ultimately, however, the con *19 vention adopted an amendment deleting the 65-year limitation and continuing the existing straight seniority system. A later attempt to provide for the court’s electing its chief justice was defeated by 44-71.
|,(¡Hargrave, 37 La.L.Rev. at 790-91 (footnotes omitted).
Sentiments expressed on both sides of the debate often centered upon the pros and cons of age. Speaking on behalf of the proposed limitation of being younger than age 65 (a limitation which ultimately failed), Chairman James Dennis explained:
The defects in having him be selected solely by seniority are first of all, you encourage people who might have retired at 65, to stay on the court just for the hope of getting that honorable title. Second, you run the danger of the situation that we had recently of a rapid turnover of three chief justices in a ten-month period. Third, you might have someone who is physically and mentally able to be a justice, but not physically up to the task of being chief administrative officer in addition to being a voting and writing justice of the Supreme Court.
Id., 37 La.L.Rev. at 791 n. 110, quoting Verbatim Transcripts at 4.
On the other side of the debate, “Delegate B.B. Rayburn spoke effectively of not depriving an elderly man of having the honor of being chief justice for some time at least.” Hargrave, 37 La.L.Rev. at 791 n. Ill, citing Verbatim Transcripts at 7-14.[19]
Other delegates expressed concern not only about the feelings or honor of one individual, but about the operation of the court, if the most senior person could not become chief justice. Delegate Donald Bollinger logically noted that if an age limit were imposed, it would be possible to have all justices be over the age of 65 at the time of a vacancy and, hence, no one could be chief. See Verbatim Transcripts at 740. Delegate Bollinger also suggested it would be unwise to have a situation in _Jjjwhich a newly elected justice could be 30 years of age and become chief justice if the other justices were over the age of 65. Id. Delegate Thomas Leigh explained that even pursuant to the proposed age limit, a chief justice would not be removed upon attaining age 65, so there was no reason to think that the court could not benefit from the qualifications of someone older than 65 becoming chief justice. Id. at 741. Similarly, Delegate Wellborn Jack noted that Justice Oliver Wendell Holmes served on the United States Supreme Court until age 92. Id.
In sum, seniority — not election — is the ultimate criterion for succeeding to the position of chief justice under Article V, § 6. Being a justice at the time of a vacancy in the office of chief justice is, of course, an assumed criterion. However, the understanding of the redactors appears to have been unchanged from their understanding of the prior constitution, in that service on this court could be attained not only through election, but also through appointment. In light of the premium the *20 constitutional redactors and the electorate placed on the experience gained from serving on this court, we cannot see any reason in the constitution to limit the experience that matters to only elected experience.
The contrary argument is that because the constitution calls for judges and justices to be elected, election must be a superior criterion. The fact of election does not make one claim superior to that of the other because both justices now vying for the chief justice position were elected. Both election and appointment are described by the constitution as legitimate methods to commence service on this court. Stated differently, the constitution has an elected avenue for serving on this court and an appointment avenue for serving on this court. See La. Const, art. V, § 4 (“The state shall be divided into at least six supreme court districts, and at least one judge shall be elected from each.”); La. Const, art. V, § 5(A) (“The supreme court ... may assign 11Ra sitting or retired judge to any court.”); La. Const, art. V, § 22(B) (“Until the [judicial] vacancy is filled, the supreme court shall appoint a person meeting the qualifications for the office, other than domicile, to serve at its pleasure.”).
We cannot, therefore, look only at the elected avenue and deny the existence of the appointment avenue because we are required to give effect to both avenues in the context of discerning what seniority applies to qualify for the chief justice position. See Radiofone, Inc. v. City of New Orleans, 93-0962 (La.1/14/94), 680 So.2d 694, 698 (“When [a constitutional] provision is susceptible of different meanings, it is interpreted by examining the context and the text in which it occurs as a whole and by giving it the meaning that best conforms to its purpose.”). Similarly, we cannot ourselves choose to elevate elected service over appointed service when the constitution does not specifically call for us to do so. The only specific terminology in the constitution that allows us to distinguish between one avenue or the other for becoming chief justice is seniority, ie., being “oldest in point of service.” See La. Const, art. V, § 6. To hold otherwise would be to elevate a general framework (ie., the general process for the election of judges described elsewhere in the constitution [20]) over a provision of the constitution that speaks specifically to the qualification for becoming chief justice (ie., the seniority required by Article V, § 6). Our jurisprudence, instead, holds that “if one constitutional provision addresses a subject in general terms, and another addresses the same subject with more detail, the two provisions should be harmonized if possible, but if there is any conflict, the latter will prevail.” Ocean Energy, 04-0066 at 7, 880 So.2d at 7, citing Perschall, 96-0322 at 22, 697 So.2d at 255. To the extent one claim creates |19a conflict between the criterion of election and the criterion of seniority, we find that seniority is the more specific qualification for qualifying for the position of chief justice and seniority under Article V, § 6, therefore, is not limited to those who were elected.
Returning to the question facing this court, “Does appointed service count when determining who on this court is ‘oldest in point of service’ for purposes of Article V, § 6?” The answer is: “Yes.” Likewise, the combination of elected and appointed service that is “oldest” on this court is that of Justice Johnson.
*21 Although Justice Johnson’s appointment violated the numerical limit of seven justices that the constitution imposes upon this court in La. Const, art. Y, § 3, the appointment was otherwise within this court’s plenary power, as this court explained in Perschall, 96-0322 at 23, 697 So.2d at 256. Just as this court gave, and continues to give, effect to the judgments rendered when Justice Johnson was appointed to this court (see Id.[21]) and because there were indubitably other provisions of the constitution with which her appointment complied (e.g., she was duly elected judge and was appointed to this court and, therefore, not “a usurper of an office” as this court has also explained (Id,., 09-0322 at 31, 697 So.2d at 261)), there is no impediment to giving effect to La. Const, art. V, § 6 by recognizing Justice Johnson’s seniority accrued during the time of appointment.
Thus, although in Perschall this court held that having an eighth justice on the court violated the numerical limit of La. Const, art. V, § 3, the fact of the matter is 12f|that the determination in Perschall was made after nearly three years of service on this court by Justice Johnson. In its ruling in Perschall, this court emphatically did not discount those years of service: “nor does this opinion in any way diminish the hard work and service on this court of Justices Revius O. Ortique, Jr. and Ber-nette Joshua Johnson, the judges who have been elected to serve in the ‘Chisorn seat’.” Perschall, 96-0322 at 2, 697 So.2d at 243.
Now that this court is faced with the question of which of two justices, who have long served on this court, should become its next chief justice, the Louisiana Constitution compels that Justice Johnson’s chronologically longer service be given effect. Service that was constitutionally sufficient in one regard must be sufficient in all regards not otherwise prohibited by law. Ultimately, this court’s holding in Persc-hall, where it was determined that although the Chisorn seat violated a numerical limit in the constitution, it was also determined that because this court had the power to appoint judges to the Chisorn seat, each and every action taken by the justices serving in the Chisorn seat would continue to be given effect. Id., 96-0322 at 31-32, 697 So.2d at 261. Neither Article V, § 6 nor any other relevant provision makes any distinction between elected service and appointed service. Thus, upon Chief Justice Kimball’s retirement in early 2013, Justice Johnson, through an unbroken chain of both appointed and elected service on this court, has the most seniority to become the next chief justice.
Because this matter is resolved wholly on the basis of an analysis of the Louisiana Constitution, ultimately, the consent decree is rendered irrelevant for purposes of this matter.
| ^DECREE
For the reasons assigned, as between Justice Johnson and Justice Victory, Justice Johnson is presently most senior for purposes of succeeding to the office of *22 chief justice under Article V, § 6 of the Louisiana Constitution of 1974.
Any request for rehearing must be received by this court within five days from the issuance of this opinion.

. Chief Judge Burrell J. Carter, Court of Appeal, First Circuit; Chief Judge Henry N. Brown, Jr., Court of Appeal, Second Circuit; and Chief Judge Ulysses Gene Thibodeaux, Court of Appeal, Third Circuit, participating as justices ad hoc. Johnson, Knoll, and Victory, JJ., recused.

.It should be noted that, while the appointed service of a sitting Justice is presently at issue, the operation of La. Const, art. V, § 6 is not limited to this matter. Other judges have recently had significant periods of appointed service on this court, such as Justice pro tem-pore Robert Lobrano (with over 27 weeks of service) and Justice pro tempore Benjamin Jones (with over 26 weeks of service). Although neither Judge Lobrano nor Judge Jones has been elected to a full term of office on this court (neither judge has sought such a term), their service to this court shows that significant periods of appointment are not unique to a currently sitting justice, but could arise in other situations. The distinguishing characteristic in the present matter is continuous service following an election.

. See State v. Golston, 10-2804, p. 16 (La.7/1/11), 67 So.3d 452, 463 ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."); see also In re Warner, 05-1303, p. 58 (La.4/17/09), 21 So.3d 218, 258 ("the interest of due process” is served when a party is “notified ... of the substance" of the matter "and afforded an opportunity to be heard.”).

. See U.S. Const, amend. V; La. Const, art. I, § 2.

. Administrative Conference Minutes of Thursday, January 19, 1995, p. 3.

. Id., p. 2.

. However, at the Administrative Conference, the following comment was noted:
A majority of the Court members were of the respective opinions that Justice Victory is senior to Justice Johnson in succession to the office of Chief Justice because the phrase "oldest in point of service on the supreme court" as contained in Article V, § 6 of the 1974 Louisiana Constitution, was meant to encompass only service time as a duly elected Louisiana Supreme Court justice, and would not include time spent on assignment to this Court per Article V, § 5 A of the Louisiana Constitution and in accordance with the Consent Judgment in Chisom.
*12 Administrative Conference Minutes of Thursday, January 19, 1995, p. 1.
In response, Justice Johnson noted:
It is my appreciation and it is consistent with my beliefs that, in the event the constitutional issue to which reference is made in the foregoing Minutes does become ripe for decision in the future, the Conference's decision concerning customary administrative perquisites, based upon service on this Court, and the Conference’s opinion that Justice Victory is senior to Justice Johnson for constitutional purposes are to be given no precedential weight whatsoever.
Administrative Conference Minutes of Thursday, January 19, 1995, p. 6.

. Id., p. 2.

. See Declaration of Bernette J. Johnson, ¶ 17 (filed July 5, 2012, in Chisom v. Jindal, E.D.La. 86-4075).

. See generally, Id.

. Code of Judicial Conduct, Canon 3(C) provides, in pertinent part: "A judge should disqualify himself or herself in a proceeding in which the judge’s impartiality might reasonably be questioned and shall disqualify himself or herself in a proceeding in which disqualification is required by law or applicable Supreme Court rule.” In turn, La. C.C.P. art. 151(A)(4) requires recusal when ”[a] judge of any court, trial or appellate ... [i]s ... interested in the cause or its outcome.” Justice Knoll was similarly recused, because if Justice Victory’s seniority were found to be superior to that of Justice Johnson under the legal theory that service by election directly on this court trumps service by appointment, Justice Knoll would be next in line to succeed to the chief justice position before Justice Johnson.

. The relevant administrative power pursuant to Article V, § 6, has been quoted earlier in the text. In pertinent part, Article V, § 5, gives the Supreme Court the power to “establish procedural and administrative rules.” See also In re: Bar Exam Class Action, 99-2880, p. 2 (La.2/18/00), 752 So.2d 159, 160 ("Functions of this court under the judicial power include both adjudicatory functions and administrative functions."). Moreover, this court has considerable discretion in implementing its administrative power because "courts have the inherent power to do all things reasonably necessary for the exercise of their functions as courts.” Id.

. In pertinent part, La. Const, art. V, § 3 provides: "The supreme court shall be composed of a chief justice and six associate justices, four of whom must concur to render judgment.”

. See, e.g., State Bond Comm’n. v. All Taxpayers, Property Owners and Citizens of the State of La., 510 So.2d 662, 663 (La.1987) (Under La. Const, art. V, § 5(A), "[t]he constitutional grant of supervisory authority to this court is plenary, unfettered by jurisdictional requirements, and exercisable at the complete discretion of the court.”); see also Perschall v. State of Louisiana, 1996 WL 659078 (La. Nov. 8, 1996) (when confronted with the constitutionality of legislation implementing the appointed seat on this court held at the time by Justice Johnson, this court cited inter alia the All Taxpayers opinion and “the importance of this case to the public and to the orderly processes of government,” when this court "decided to bypass the lower courts and bring up all aspects of the case ... for argument and decision.").

. To accommodate a request by Judge Susie Morgan made at a status conference in Chisom v. Jindal, 86-4075 (E.D.La.7/19/12), the briefing deadline was extended.

. There was never a court ruling finding a violation of the Voting Rights Act, a fact which was noted by the U.S. Supreme Court in Chisom v. Roemer, 501 U.S. 380, 390, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) ("We ... do not address any question concerning the elements that must be proved to establish a violation of the Act or the remedy that might be appropriate to redress a violation if proved.”).

. La. Const, art. V, § 5(A) provides:

. This provision does not reference elected justices.

. Professor Hargrave’s law review article broadly paraphrased Delegate Rayburn's actual words, which included:
And I am a little shocked and a little surprised to think that we might have someone on the highest court of our land that could make decisions that govern you, your family, your children, your friends, your relatives and neighbors, but yet they were not qualified to be the chief justice. Have you thought of that? ... If they are qualified to make decisions that govern this state, they are certainly qualified in my opinion to carry their little honor and the great name of being the chief justice....
Verbatim Transcripts at 741 (pagination in the published version differs from the pagination cited by Professor Hargrave).

. The qualifications for election, including residency and admission to the practice of law for a certain numbers of years, are described in La. Const, art. V, § 24; elections to fill judicial vacancies are described in La. Const, art. V, § 22.

. This court explained that under the “de facto officer doctrine,” which is grounded in a public policy of governmental stability, the decisions of Justices Ortique and Johnson would continue to be given effect. See Perschall, 96-0322 at 31, 697 So.2d at 261. This court also explained that "[a] judge acting under color of right has the authority, capacity, and right to perform judicial duties. That capacity cannot be challenged collaterally, and the acts of a de facto judge, even if not de jure, are valid and binding.” Id., citing City of Baton Rouge v. Cooley, 418 So.2d 1321 (La.1982), and State v. Lewis, 22 La.Ann. 33 (1870) (citations omitted).